IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 23-12167

JOE CAROLLO,

*Appellant/Cross-Appellee*,

v.

WILLIAM O. FULLER and MARTIN PINILLA, II,

*Appellees/Cross-Appellants*.

OPENING BRIEF OF APPELLANT JOE CAROLLO

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Elliot B. Kula
W. Aaron Daniel
William D. Mueller
KULA & ASSOCIATES, P.A.
11900 Biscayne Blvd., Ste. 310
Miami, Florida 33181
Telephone: (305) 354-3858
eservice@kulalegal.com
elliot@kulalegal.com
aaron@kulalegal.com
william@kulalegal.com

*Co- Counsel for Plaintiff-Appellant*

*Carollo v. Fuller et al.*
<u>Case No. 23-12167</u>

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
**<u>CORPORATE DISCLOSURE STATEMENT</u>**

Defendant-Appellant, JOE CAROLLO, submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1. Arteaga-Gomez, Rossana, Esq., *Attorney for Plaintiffs-Appellees*

2. AXS Law Group, PLLC., *Attorneys for Plaintiffs-Appellees*

3. Ball and Chain

4. Barlington Group, LLC

5. Bast Amron, LLP

6. Buchanan Ingersoll & Rooney, PC, *Attorneys for the City of Miami*

7. Caprio, Courtney, Esq., *Attorney for Plaintiffs-Appellees*

8. Carollo, Joe, *Defendant-Appellant*

9. Chavies, Michael B., Esq.

10. City of Miami, Florida

11. Cole Scott & Kissane, P.A.

12. Daniel, W. Aaron, Esq., *Attorney for Defendant-Appellant*

*Carollo v. Fuller et al.*
<u>Case No. 23-12167</u>

**CERTIFICATE OF INTERESTED PERSONS**

**AND**

<u>**CORPORATE DISCLOSURE STATEMENT**</u>
(Continued)

13.    Davis, Michael T., Esq.

14.    Dawson, Amber C., Esq.

15.    Dooley, Rachel, Esq.

16.    Ferot, Alice, Esq., *Attorney for Plaintiffs-Appellees*

17.    Fuller, William O., *Plaintiff-Appellee*

18.    Goldberg, Daniel, Esq., *Former Assistant City Attorney*

19.    Green, Christopher Allan, Esq., *Former Assistant City Attorney*

20.    Gutchess, Jeffrey W., Esq., *Attorney for Plaintiffs-Appellees*

21.    Jones, Kevin Renard, Esq., *Assistant City Attorney*

22.    Krinzman Huss Lubetsky *et al.*, *Attorneys for Defendant-Appellant*

23.    Kuehne, Benedict P., Esq., *Attorney for Defendant-Appellant*

24.    Kuehne Davis Law, P.A., *Attorneys for Defendant-Appellant*

25.    Kula, Elliot B., Esq., *Attorney for Defendant-Appellant*

26.    Kula & Associates, P.A., *Attorneys for Defendant-Appellant*

*Carollo v. Fuller et al.*
<u>Case No. 23-12167</u>

**CERTIFICATE OF INTERESTED PERSONS**

**AND**

<u>**CORPORATE DISCLOSURE STATEMENT**</u>
(Continued)

27.   Lewis, Hon. Lauren F., U.S. Magistrate Judge

28.   Lugo, Maria

29.   Lyman, Chance, Esq., *Attorney for the City of Miami*

30.   Malone, James Matthew

31.   Marrero, Asael

32.   Martinez-Molina, Aleida, Esq.

33.   Mendez, Victoria, Esq., *Assistant City Attorney*

34.   Mueller, William D., Esq., *Attorney for Defendant-Appellant*

35.   Niworowski, Joanna, Esq., *Attorney for Plaintiffs-Appellees*

36.   Noriega, Arthur

37.   Pertnoy, Mason, Esq., *Attorney for Defendant-Appellant*

38.   Pinilla, Martin, II, *Plaintiff-Appellee*

39.   Rodriguez, Raquel A., Esq., *Attorney for the City of Miami*

40.   Rose, Brandon Perry, Esq.

41.   Sandridge, Hala A., Esq., *Attorney for the City of Miami*

*Carollo v. Fuller et al.*
<u>Case No. 23-12167</u>

**CERTIFICATE OF INTERESTED PERSONS**

**AND**

<u>**CORPORATE DISCLOSURE STATEMENT**</u>
(Continued)

42.    Sanguich de Miami

43.    Sarnoff, Marc D., Esq., *Attorney for Defendant-Appellant*

44.    Scott, Thomas E., Jr., Esq.

45.    Shore, Joshua A., Esq.

46.    Shutts & Bowen, *Attorneys for Defendant-Appellant*

47.    Smith, Hon. Rodney, *U.S. District Court Judge*

48.    Soto, Miranda Lundeen, Esq.

49.    Stolow, Jesse, Esq., *Attorney for the City of Miami*

50.    Suarez, Amanda, Esq., *Attorney for Plaintiffs-Appellees*

51.    Tannenbaum, Brian Lee, Esq.

52.    Taquerias El Mexicano/Los Alto

53.    Union Beer

54.    Viernes Culturales

55.    Wydler, Lourdes E., Esq.

56.    Wydler Law

*Carollo v. Fuller et al.*
<u>Case No. 23-12167</u>

**CERTIFICATE OF INTERESTED PERSONS**

**AND**

<u>**CORPORATE DISCLOSURE STATEMENT**</u>
(Continued)

Pursuant to Federal Rule of Appellate Procedures 26.1 and Eleventh Circuit Rules 26.101 through 26.1-3, Defendant-Appellant, Joe Carollo, makes the following statement as to corporate ownership:

JOE CAROLLO is an individual.

WILLIAM O. FULLER and MARTIN A. PINILLA, II., are individuals.

<u>/s/</u> <u>**Elliot B. Kula**</u>
Elliot B. Kula

## STATEMENT REGARDING ORAL ARGUMENT

This appeal arises out of a 24-day jury trial, resulting in an award exceeding $60 million against a sitting commissioner of the City of Miami. That aside, the underlying dispute arises out of a section 1983 claim for retaliation against the plaintiffs for their support of an oppositional candidate, and the implication of constitutional principles would benefit from vetting at oral argument. More, the Court will see that the process was tainted by evidence of jury tampering, which the district court rejected without full process (that is, merely rejecting the unrebutted evidence of such). And thereon lies the $60 million verdict. Oral argument will assist the Court in navigating the course of proceedings and allow a fulsome discussion of the issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE................................................................................3

    I.     THE FACTS...................................................................................3

          A.     The Charter of the City of Miami Confers Limited
                and Constrained Power on Commissioners. ...............................3

          B.     The Non-Party Speech. .............................................................4

                (1)    Altos Mexicanos, LLC and 1393, LLC
                        Supported Carollo's Opponent in the
                        Election for Commissioner by Donating
                        Funds and Hosting Rallies on LLC Property. .................4

                (2)    The Barlington Group, LLC Lodged an
                        Ethics Complaint Against Carollo....................................4

          C.     Plaintiffs' Business Entities and Tenants Violated
                 City Ordinances and the Florida Building Code........................5

                  (1)    Calle Ocho Marketplace. ..................................................6

                  (2)    Sanguich de Miami.............................................................7

                  (3)    Altos Mexicano, LLC. .......................................................8

                  (4)    Ball & Chain. .....................................................................9

                  (5)    Compliance Agreements for Beatstik, Piedra
                        Villas, Little Havana Arts II, LLC..................................10

ii

    D.     Carollo Commented on Plaintiffs' Tenants and Business Associates on the Radio...............................10

II.    COURSE OF PROCEEDINGS. ..........................................11

    A.     Plaintiffs Sued Carollo for First Amendment Retaliation under Section 1983.....................................11

    B.     Second Amended Complaint. ....................................11

    C.     Carollo's Motion to Dismiss.....................................12

    D.     Carollo's Answer and Affirmative Defenses............13

    E.     Plaintiffs Brought a Separate, Related Action Against the City for Additional Alleged Acts of Retaliation (the "Mad Room" Case). ........................13

    F.     Trial. .........................................................................14

         (1)    Motion for Mistrial Based on Jury Tampering...................................................14

         (2)    Failure to Instruct Jury on Probable Cause and Exclusion of Relevant Evidence..............19

         (3)    Evidence of Noneconomic Damages.............20

         (4)    Motion for Judgment as a Matter of Law and Ruling. ..............................................21

    G.     Post-Trial Motions and Rulings. ...............................22

         (1)    Carollo's Motion for New Trial, Judgment as a Matter of Law, and Remittitur.................22

         (2)    The District Court Denied Carollo's Post-Trial Motions. ..................................23

STATEMENT OF THE STANDARD OF REVIEW ...........................24

SUMMARY OF ARGUMENT ...............................................................26

ARGUMENT ................................................................................29

I.  THE DISTRICT COURT FAILED TO DISPEL THE
    PRESUMPTION OF PREJUDICE THAT ATTACHED
    DUE TO EVIDENCE OF JURY TAMPERING BY
    PLAINTIFFS' BUSINESS PARTNER. ..............................................29

    A.  The Governing Standard. ........................................................29

    B.  The Undisputed Evidence of Jury Tampering by
        Plaintiffs' Business Partner, Zach Bush. ..................................31

    C.  The District Court Failed to Discharge Its Duty to
        Safeguard the Jury Process by Refusing to
        Question Zach Bush. ..............................................................32

    D.  Plaintiffs Failed to Rebut the Presumption of
        Prejudice Due to the Nature of the Contact, the
        Manner it Reached the Jury, and the Weakness of
        Plaintiffs' Case. ....................................................................35

II. CAROLLO WAS ENTITLED TO JUDGMENT AS A
    MATTER OF LAW. ...................................................................37

    A.  Plaintiffs Failed to Prove Carollo Acted Under
        Color of Law Because there Was No Evidence that
        Carollo's Actions Were Made Possible Only
        Because of His Authority as Commissioner. ...........................37

    B.  Plaintiffs Produced No Evidence that they
        Engaged in Protected Activity. ..............................................44

        (1)  Non-Party LLCs Engaged in
             Speech — Plaintiffs Did Not. ........................................44

        (2)  Members Cannot Sue Based on their LLC's
             Speech. ......................................................................47

    C.  Plaintiffs Failed to Produce Evidence of a Causal
        Connection Between the Retaliatory Animus and
        Their Purported Injuries (Probable Cause
        Supported the City's Enforcement Actions). ...........................48

iv

III.   THE GROSSLY EXCESSIVE DAMAGES WARRANT
       A NEW TRIAL. ...................................................................54

       A.   The Emotional Damages Awards Are Unsupported
            by the Evidence and Shock the Conscience.............................54

            (1)   Legal Standard. ................................................................54

            (2)   The $15.9 Million Noneconomic Damages
                  Award is Multiples of Comparable
                  Emotional and Reputational Harm Damage
                  Awards. .........................................................................55

       B.   Punitive Damages Violated Due Process.................................58

CONCLUSION ...........................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AcryliCon USA, LLC v. Silikal GMBH & Co.*,
46 F.4th 1317 (11th Cir. 2022) ...........................................................24

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
481 F.3d 1302 (11th Cir. 2007) ..........................................................59

*Ash v. Tyson Foods, Inc.*,
664 F.3d 883 (11th Cir. 2011) .................................................... 56, 58

*Bey v. City of Tampa Code Enf't*,
607 Fed. Appx. 892 (11th Cir. 2015).................................................50

*Brochu v. City of Riviera Beach*,
304 F.3d 1144 (11th Cir. 2002) ..........................................................24

*Butler v. Sheriff of Palm Beach Cnty.*,
685 F.3d 1261 (11th Cir. 2012) ............................................ 41, 42, 43

*City of Newport v. Fact Concerts, Inc.*,
453 U.S. 247 (1981)............................................................................60

*Colonies v. County of San Bernardino*,
2020 U.S. Dist. LEXIS 160672 (C.D. Cal. July 28, 2020).................47

*Cullum v. Packo*,
947 So. 2d 533 (Fla. 1st DCA 2006) ..................................................46

*DeMartini v. Town of Gulf Stream*,
942 F.3d 1277 (11th Cir. 2019) ...................................... 48, 49, 50, 51

*Dossett v. First State Bank*,
399 F.3d 940 (8th Cir. 2005) ..............................................................57

*Edwards v. Wallace Cmty. Coll.*,
49 F.3d 1517 (11th Cir. 1995) ...................................... 38, 39, 40

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008)............................................................................58

*Ferrill v. Parker Group, Inc.*,
168 F.3d 468 (11th Cir. 1999) ............................................................55

*Fylling v. Royal Caribbean Cruises, Ltd.*,
  91 F.4th 1371 (11th Cir. 2024) ............................................................30

*Gathright v. City of Portland, Or.*,
  439 F.3d 573 (9th Cir. 2006) ...............................................................45

*Grassilli v. Barr*,
  48 Cal. Rptr. 3d 715 (Ct. App. 2006) .............................................. 59-60

*Gregory v. Mitchell*,
  634 F.2d 199 (5th Cir. 1981) ...............................................................48

*Hare v. Zitek*,
  2006 WL 4069052 (N.D. Ill. Dec. 28, 2006)......................................60

*Hartman v. Moore*,
  547 U.S. 250 (2006)................................................... 49, 50, 51, 53

*Jackson v. Magnolia Brokerage Co.*,
  742 F.2d 1305 (11th Cir. 1984) ...........................................................54

*Jennings v. Town of Stratford*,
  263 F. Supp. 3d 391 (D. Conn. 2017)...................................................59

*Johansen v. Combustion Eng'g, Inc.*,
  170 F.3d 1320 (11th Cir. 1999) ...........................................................59

*Long v. E. Coast Waffles, Inc.*,
  762 Fed. Appx. 869 (11th Cir. 2019)....................................................54

*Lovell v. City of Griffin, Ga.*,
  303 U.S. 444 (1938)..............................................................................47

*Mattox v. U.S.*,
  146 U.S. 140, 36 L. Ed. 917, 13 S. Ct. 50 (1892)................................29

*Moore v. Appliance Direct, Inc.*,
  708 F.3d 1233 (11th Cir. 2013) ...........................................................25

*Morris v. Crow*,
  117 F.3d 449 (11th Cir. 1997) .............................................................24

*Myers v. Bowman*,
  713 F.3d 1319 (11th Cir. 2013) ................................... 40, 41, 44, 53

*Nichols v. Fannin*,
  1:16-CV-4700-JSA, 2018 WL 2220872 (N.D. Ga. Apr. 16, 2018) ...................56

vii

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) .........................................................................48

*Oakes Farms Food & Distribution Services, LLC v.*
*Sch. Dist. of Lee Cnty., Florida*,
    541 F. Supp. 3d 1334 (M.D. Fla. 2021) ............................................47

*Paeth v. Worth Tp.*,
    483 Fed. Appx. 956 (6th Cir. 2012) ............................................ 56, 58

*Port Terminal & Warehousing Co. v. John S. James Co.*,
    695 F.2d 1328 (11th Cir. 1983) .........................................................31

*Quintana v. Jenne*,
    414 F.3d 1306 (11th Cir. 2005) ........................................................24

*Remmer v. U.S*,
    347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954)...........................29

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006).............................................................................45

*Salinas v. O'Neill*,
    286 F.3d 827 (5th Cir. 2002) ............................................................57

*Simon v. Shearson Lehman Bros., Inc.*,
    895 F.2d 1304 (11th Cir. 1990) ................................................ 54, 55

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).........................................................................59

*Sykes v. McDowell*,
    786 F.2d 1098 (11th Cir. 1986) ............................................... 54, 55

*Turner v. Williams*,
    65 F.4th 564 (11th Cir. 2023) ................................................... 38, 44

*U.S. v. Caporale*,
    806 F.2d 1487 (11th Cir. 1986) ........................................................29

*U.S. v. Gabay*,
    923 F.2d 1536 (11th Cir. 1991) .................................................. 35-36

*U.S. v. Lanier*,
    988 F.3d 284 (6th Cir. 2021) .................................................... 31, 34

*U.S. v. Martinez*,
   14 F. 3d 543 (11th Cir. 1994) ...................................................... 24, 29, 30, 32, 37

*U.S. v. Mayweather*,
   991 F.3d 1163 (11th Cir. 2021) ......................................................................51

*U.S. v. Ramirez*,
   426 F.3d 1344 (11th Cir. 2005) ......................................................................24

*U.S. v. Ronda*,
   455 F. 3d 1273 (11th Cir. 2006) .............................. 24, 30, 31, 32, 34, 35, 36, 37

*U.S. v. Rowe*,
   906 F.2d 654 (11th Cir. 1990) ................................................................... 30, 35

*U.S. v. Spurlock*,
   811 F.2d 1461 (11th Cir. 1987) ......................................................................29

*Walker v. Dixon*,
   840 Fed. Appx. 397 (11th Cir. 2020)........................................ 38, 40, 41, 42, 43

*Warth v. Seldin*,
   422 U.S. 490 (1975)........................................................................................47

*West v. Atkins*,
   487 U.S. 42 (1988)............................................................................... 38, 40, 43

*Williams v. First Advantage LNS Screening Sols. Inc*,
   947 F.3d 735 (11th Cir. 2020) ........................................................................59

*Wilson v. Taylor*,
   733 F.2d 1539 (11th Cir. 1984) ................................................................ 56, 58

*Woods v. Burlington N. R. Co.*,
   768 F.2d 1287 (11th Cir. 1985), *rev'd for other reasons*,
   480 U.S. 1 (1987)............................................................................................54

*Woods v. Reeve*,
   No. 21-14001, 2022 U.S. Dist. LEXIS 72666 (S.D. Fla. Apr. 20, 2022)............60

*Wright v. Sheppard*,
   919 F.2d 665 (11th Cir. 1990) ................................................................. 54, 55

*Zinman v. Nova SE. Univ., Inc.*,
   2023 U.S. App. LEXIS 7402 (11th Cir. Mar. 29, 2023) ...................................45

**Statutes & Other Authorities:**

U.S. Const., amend. I ................................................. 11, 21, 47, 48, 49, 60

U.S. Const., amend. XIV ............................................................ 38, 41

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

42 U.S.C. § 1981 ..............................................................................56

42 U.S.C. § 1983 ............................... 1, 3, 11, 38, 41, 43, 54, 60

Charter of the City of Miami, § 4(a) ............................................ 39, 41

Charter of the City of Miami, § 4(d) ..........................................3, 39

Charter of the City of Miami, § 4(f) ..........................................3, 39

Fla. Stat. § 106.08 ..........................................................................46

Fla. Stat. § 605.0110 ......................................................................46

## STATEMENT OF JURISDICTION

The district court had jurisdiction to hear the underlying case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, because this appeal arises from a final judgment of the district court.

## STATEMENT OF THE ISSUES

The issues arise from a trial on claims that should have been resolved as a matter of law, and the trial itself was tainted by unrebutted evidence of jury tampering because the district court failed to follow through with the required inquiry. The result was an extraordinary verdict untethered to any view of the evidence.

Three issues are presented for the Court's consideration.

## I.

The district court misapplied the legal standard when it was presented **unrefuted** evidence of jury tampering by Plaintiffs' business partner. The circumstances were confirmed by the juror with whom Plaintiffs' business partner made contact, and verified with several other jurors with whom the tampering had been shared. And while the standard required the district court to examine and

develop the factual circumstances, that was not done.  It was a per se abuse of discretion to deny the requested mistrial.

## II.

Judgment as a matter of law is required because plaintiffs failed to prove (i) the defendant acted under color of law, (ii) that plaintiffs engaged in protected activity, and (iii) that there was a causal connection between defendant's alleged actions and any harms.

## III.

A new trial is warranted because the compensatory damages are excessive and without justification in evidence or comparable cases and the award of punitive damages is unconstitutional and shocks the conscience.

## STATEMENT OF THE CASE

## I.    THE FACTS.

### A.  The Charter of the City of Miami Confers Limited and Constrained Power on Commissioners.

Joe Carollo, a sitting Commissioner of the City of Miami (the "City"), was sued under Section 1983 for allegedly abusing the powers granted to him by the Charter of the City of Miami Charter (the "City Charter"), allegedly to retaliate against various LLCs owned in part by Plaintiffs (William Fuller and Martin Pinilla), due to the LLC's political speech.  DE:125.

But the City Charter confers limited authority on City Commissioners, who may hold meetings, and engage in legislative inquiries to inform the exercise of their power to pass ordinances.  §§ 4(d) & (f), Charter of the City of Miami (2018), *available at* https://library.municode.com/fl/miami/codes/code_of_ordinances?nodeId=PTICHRELA_SPATCH_S4FOGONOEL.  *See also* DE:506-4:3–55 (City Charter and Code, admitted as Plaintiffs' Exhibit 303).

Indeed, the Charter expressly withhold from Commissioners the power to from "give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately."  § 4(d).[1]

---

[1] The scope of Carollo's position as a Commissioner will be important to arguments on appeal.

**B. The Non-Party Speech.**

**(1) Altos Mexicanos, LLC and 1393, LLC Supported Carollo's Opponent in the Election for Commissioner by Donating Funds and Hosting Rallies on LLC Property.**

In November of 2017, non-party Jenny Lee Molina, in conjunction with non-party LLCs (in which Plaintiffs owned interests), held rallies to support candidate Alfie Leon for commissioner, against Carollo.  DE:559:52–53, 222–23.  The rallies were held on property owned by non-party, 1393, LLC.  DE:559:221.  Neither Plaintiff was named on rally advertisements.  DE:559:222–23.

Leon's campaign finance records showed Altos Mexicanos, LLC, another entity in which Plaintiffs held membership interests, made campaign contributions.  DE:559:217–19.  But neither Plaintiff personally contributed.  *Id.*

Fuller did not attend either rally.  DE:560:187.

**(2) The Barlington Group, LLC Lodged an Ethics Complaint Against Carollo.**

After Carollo was elected, the Barlington Group, LLC, another non-party entity in which Plaintiffs held membership interests, brought an ethics complaint against Carollo and others for intentionally seeking to harm it by shutting down the Barlington Group's Christmas Party and enforcing the City code against various restaurants and bars it owned.  DE:506-15:48, 51–53.

4

Fuller "filed [the ethics complaint] on behalf of the Barlington Group." DE:563:20 (emphasis added).  Pinilla confirmed that.  DE:560:83–84.  (The Barlington Group later withdrew its complaint.  DE:558:161.)

**Note**:  Altos Mexicanos, LLC, 1393, LLC, and Barlington Group LLC did not join the action as parties.

### C. Plaintiffs' Business Entities and Tenants Violated City Ordinances and the Florida Building Code.

Entities in which Plaintiffs owned membership interests in turn owned property in Miami's historic Little Havana district along 8th Street, known as "Calle Ocho."  DE:547:75–76.  Calle Ocho is the main business hub in Carollo's District.  DE:557:51–52.

Plaintiffs' entities repeatedly violated City ordinances and the Florida Building Code in Little Havana — detailed, in part, in an Eleventh Judicial Circuit of Florida, Appellate Division opinion affirming one such code enforcement proceeding.  *See* DE:251-3.  It was a pattern and practice of doing unpermitted work, and coming into compliance only after the City brought enforcement actions.  DE:564:118–19.  As one Assistant City Attorney put it, "some people collect coins and some collect stamps … Fuller, seemed to collect unsafe structures."  DE:565:143.

And the City routinely prosecuted serial violators in the historic neighborhood.  DE:566:122–32 (Assistant City Attorney denying selective

5

enforcement);  DE:251-3 (Appellate panel decision rejecting selective enforcement). Indeed, Plaintiffs admitted to being in violation of the City code in numerous compliance agreements.  *See* DE:506-14:360, 364;  DE:506-15:1, 5.  *See also* DE:506-15:47 (Email from Fuller admitting tenant was operating without permits); DE:566:125.

The City's enforcement efforts can be grouped as follows.

**(1) Calle Ocho Marketplace.**

Calle Ocho Marketplace, LLC (another of Plaintiffs' entities) was cited for unpermitted metal kiosks, made from cut-up shipping containers with makeshift roofs. DE:549:174; DE:566:27-28, 42, 198–99. The City gave "notice and multiple opportunities to correct the violation over an extended period of time" (DE:251-3:8), which the owners ignored; they appealed the final Code Enforcement Board ruling ordering the removal of the metal kiosks, and the Eleventh Judicial Circuit's Appellate Division affirmed the ruling.  DE:566:30–40.  *See also* DE:251-3.

The City Attorney's office initiated an unsafe structures case against Calle Ocho Marketplace for a single-family home, which had been gutted without permits and was drawing electricity by extension cords spliced into neighboring properties' and FPL power lines without authorization.  DE:566:25–29, 150–55. The house was demolished in 2022, after numerous extensions and opportunities to bring the structure into compliance.  DE:566:39–52, 153–55.

6

Carollo gave no orders or directions with respect to enforcement against Calle Ocho Marketplace. DE:566:53–54. The Assistant City Attorney handling the Calle Ocho Marketplace enforcement action proceeded independently. DE:566:50–54.

### (2) Sanguich de Miami.

Sanguich was a tenant at the Calle Ocho Marketplace (DE:562:130–31), which operated a sandwich shop out of one of the aforementioned (non-compliant) modified shipping container kiosks it leased from Futurama, LLC (in which Plaintiffs had membership interests). DE:556:180–83, 187–88; DE:560:108; DE:562:125–26; DE:565:102. Sanguich was given various notices of violations by inspectors. DE:556:180–83, 187–88; DE:565:233–34; DE:566:147–50.

The City Code Enforcement Department issued citations to Sanguich after the City Attorney's office attempted to find an interpretation of the code that would allow Sanguich to continue operating. DE:556:182–83, 187–88; DE:565:235; DE:566:25.

Carollo did not order Sanguich to be removed or cited, as confirmed by the head of the Code Enforcement Department. DE:556:182-83. The investigators, then City Manager Daniel Alfonso (DE:564:192–93), and City Attorney's Office came to their own independent conclusion that it was in violation of the code. DE:565:235; DE:556:187-88.

### (3) Altos Mexicano, LLC.

Taquerias El Mexicano and Los Altos, restaurants owned by Altos Mexicano, LLC (an entity in which Plaintiffs possessed membership interests, *see* DE:561:190), were cited for numerous code violations related to remodeling work performed without a permit (including illegal electrical work and outdoor seating without a permit, *see* DE:566:35–40), as well as failure to complete the 40-year recertifications.  DE:564:90–93, 98–103; DE:566:71–85, 293.

Assistant City Attorney Goldberg also independently determined the restaurants' alcohol reservation (permitting the restaurants to convert to bars) needed to be cancelled because of the restaurants' unlawful proximity to a religious establishment.  DE:565:168–70.  And he had a meeting with the City Manager and City Attorney regarding the Taquerias property's certificate of use (at which Carollo was present).  DE:565:157–60.

The owners of the restaurant and bar conceded to the violations, and agreed to obtain proper permits.  *See* DE:566:84 (Assistant City Attorney addressing email from property owners' counsel:  "He's letting the city know that they're pulling a permit to correct the violations.  If you don't have a violation, you don't need to pull a permit.  If you do, you do.").

8

**(4) Ball & Chain.**

Mad Room, LLC operated the Ball & Chain bar (DE:553:84–85), on property owned by Little Havana Arts Building, LLC, abuttin residential properties. DE:562:35. Plaintiffs have membership interests in both LLCs. DE:561:159.

In 2017, *prior to Carollo's election to the City Commission*, the bar received six noise complaints. DE:562:170–74. Ball & Chain continued to violate noise ordinances through 2020, receiving numerous additional citations. DE:558:57–59; DE:565:136–38; DE:566:55–59. Carollo, himself, reported Ball & Chain several times for noise and parking violations. DE:561:22–23.

Ball & Chain's owner was also cited numerous times for unpermitted work, and "unsafe structure violations." DE:564:80–81; DE:566:61–70.

The City Attorney's office, upon appeals by Ball & Chain, reviewed the noise citations and assessed their legal sufficiency with the inspectors who issued the citations, dismissing some citations and prosecuting other. DE:566:57–75. *See also* DE:565:137 (Assistant City Attorney Goldberg concluding "Ball & Chain already has a frankly terrible track record" on noise); DE:561:22–24 ("Ball & Chain was visited by multiple police officers and Code Enforcement officers as a result").

Ball & Chain's owners were also cited for noncompliant work after a fire. DE:564:83–85. The owners remained out of compliance after submitting insufficient

and misleading plans to the City during the permitting process.   DE:564:88–90; DE:566:70–80.

And to be clear, while Carollo reported what he thought to be unpermitted and noncompliant construction at the night club, at no point was the Building Director aware of anyone within his department receiving any orders from Carollo.  DE:556:8; DE:564:90.

### (5) Compliance Agreements for Beatstik, Piedra Villas, Little Havana Arts II, LLC.

The City entered into several compliance agreements with entities in which Plaintiffs owned membership interests to remedy various code violations, which agreements contained admissions that the work was done without permits and that there were unsafe structure violations.  DE:566:97–105.  *See also* DE:566:119–122.

### D. Carollo Commented on Plaintiffs' Tenants and Business Associates on the Radio.

On a radio appearance, Carollo discussed how one of Plaintiffs' entities' tenants had a step-father who was associated with Venezuelan guerillas that fought in the Cuban revolution for Fidel Castro, and who had been trained in Moscow. DE:555:73–74.  Carollo discussed how this tenant's stepfather held a high-ranking government position in Venezuela for both Chavez and Maduro.  *Id*.  Carollo also spoke about his understanding that this tenant held positions in the Venezuelan government, as well.  *Id*.  Carollo further discussed how his Chief of Staff found

reports that people were protesting this tenant because of her connection. DE:555:75–76. *See also* DE:506-4:57–108 (Transcript of Radio Broadcast).

Carollo also remarked on this radio show about the new class of businessmen trying to buy up real-estate in Little Havana to change its character. DE:555:80–81. But Carollo never mentioned Plaintiffs. DE:558:192. *See also* DE:506-4:57–108.

## II. COURSE OF PROCEEDINGS.

### A. Plaintiffs Sued Carollo for First Amendment Retaliation under Section 1983.

Plaintiffs brought First Amendment retaliation claims under 42 U.S. Code § 1983 against Carollo (and the City and other City officials), based chiefly on the City's enforcement actions against the LLCs in which Plaintiffs had membership interests, and Carollo's comments on the radio broadcast. DE:1.

### B. Second Amended Complaint.

The Second Amended Complaint dropped the other defendants, leaving only Carollo. DE:125. Plaintiffs alleged that Carollo's retaliatory actions against Plaintiffs included:

- harassing Barlington Group tenants, including Sanguich, over permits and code violations;

- fabricating Noise Complaints against Ball & Chain (DE:125:28–29);

- enforcing code violations against Calle Ocho Marketplace (DE:125:32–33);

- lodging anonymous complaints (DE:125:34-37);

- lurking near Ball & Chain with a Board of Code Enforcement member (DE:125:38-39);

- defaming Fuller on radio broadcasts  (DE125:42-43).

Plaintiffs alleged they **personally** "exercised their right to free speech and free association by supporting [] Leon in the run-off election and hosting a rally for [him] on [their] property."  DE125:53.  And they alleged that "Fuller, c/o The Barlington Group" filed an ethics complaint against Carollo.  DE125:30.

## C.  Carollo's Motion to Dismiss.

Carollo moved to dismiss the Second Amended Complaint, raising Plaintiffs' lack of standing to assert violations of the First Amendment rights of the non-party LLCs.  DE:154:14.

The district court denied the motion to dismiss, ruling that "the conduct alleged to have impacted non-party entities are examples of [Defendant's] retaliatory conduct towards Plaintiffs, as he allegedly targeted all business that Plaintiffs are associated with."  DE:186:9.  But the district court granted the motion to dismiss "to the extent Plaintiffs seek to recover monetary damages allegedly suffered by non-parties," essentially restricting Plaintiffs' damages to noneconomic harms personal only to them. *Id*.

**D. Carollo's Answer and Affirmative Defenses.**

Carollo answered the Second Amended Complaint and asserted the following pertinent affirmative defenses:

- Plaintiffs lacked standing to vindicate alleged harms to non-parties,

- Carollo did not act in bad faith or with a malicious purpose,

- Any injury, loss, or damage was the result of intervening causes,

- Plaintiffs repeatedly and continually violated the City Code.

DE:201:64–71.

**E. Plaintiffs Brought a Separate, Related Action Against the City for Additional Alleged Acts of Retaliation (the "Mad Room" Case).**

While Plaintiffs' claims in the underlying case were still pending, four entities, including Mad Room, LLC, brought a separate suit against the City for alleged retaliatory actions involving the same businesses and restaurants at issue in the underlying action by Plaintiffs. *See* DE:464:5 (referencing *The Mad Room LLC et al. v. The City of Miami*, Case No.: 1:18-cv-24190, U.S. District Court, Southern District of Florida).

In the "Mad Room" action, Plaintiffs' business partner, Zach Bush, testified that he was "vested in the outcome of" Plaintiffs' underlying action against Carollo, as he was funding the action and entitled to 20% of the recovery from Carollo. DE:425-3. *See also* DE:553:31.

13

## F.  Trial.

Trial ran from April 10th to June 1st of 2023; and at the conclusion, the jury awarded $15.9 million in noneconomic damages for Plaintiffs' collective emotional distress, and an additional $47.6 million in punitive damages, for a total of $63.5 million (for which Carollo is personally liable).  DE:470.

Several points of the trial are pertinent to this appeal.

### (1) Motion for Mistrial Based on Jury Tampering.

#### PLAINTIFFS' BUSINESS PARTNER AND LITIGATION FUNDER CONTACTED JUROR 3

On April 24, 2023, the district court received a note from Juror 3, reporting that she had been followed into the parking garage the previous day by "a young man that [she] recognized from attending the trial *on the plaintiffs' side*." DE:552:8–10 (emphasis added).  He followed her into the garage elevator, and commented:  "I'm following you."  *Id*.  He warned her to "be careful because … a former chief of police came to testify, [and] … was followed by two PIs," and he encouraged her to look up the case "on social media."  *Id*.  He concluded by repeating his warning that "everyone should be careful."  DE:552:8–10.

The district court briefly interviewed Juror 3, who confirmed that the man who followed her had been present at trial every day, including that very morning. DE:552:19–23.  Juror 3 reported that the incident scared her, and when she told her fellow jurors about it, they convinced her to report it.  DE:552:22–23.

14

The district court briefly interviewed the other jurors, six of whom confirmed Juror 3 told them she had been followed, was told to be careful, and was warned about witnesses being followed — and that the incident scared her.  DE:552:25–33.

Carollo's counsel confirmed that the man who scared Juror 3 was Plaintiffs' business partner, Zach Bush, who admitted in the "Mad Room" action that he was "vested in the outcome" of this case against Carollo due to his 20% interest in the jury's award.  DE:552:35, 196–9.  *See also* DE:397, 409, 437, 481 (affidavits from attendees confirming Zach Bush wearing same clothing as man from garage), DE:425-3 (Zach Bush's testimony).  Indeed, the jury knew Zach Bush, and his relationship with Plaintiffs, from Carollo's opening statement, during which a video was played showing Zach Bush harassing Carollo on the street.  DE:546:53.  He was central to the defense's "who was harassing who?" theme presented to the jury in the opening statement. DE:546:53.

Plaintiffs did not dispute that Zach Bush was financing their litigation against Carollo.  And footage from the parking garage security cameras showed Zach Bush intentionally following Juror 3 into an elevator.  *See* 425-2 (Affidavit of Miami Parking Authority records custodian);  DE:481 (Notice of Filing *Under Seal* Videos of Miami Parking Authority).  Plaintiffs admitted that their business partner, Zach Bush, had followed and scared Juror 3 in a secluded parking garage elevator. DE:422:5.  And the video showed that Zach Bush stood directly behind Juror 3, on

15

his phone appearing to be texting someone.  DE:481 (Notice of Filing **Under Seal** Videos of Miami Parking Authority).

The district court, however, was far from concerned about the substantial financial stake held by someone intentionally contacting a member of his jury, or the video showing Zach Bush in the elevator with Juror 3;  he simply commented that such an investment was "***an individual's right***."  DE:564:175 (emphasis added).

Carollo repeatedly requested the district court to order Zach Bush to appear in court to answer for his intentional contact with Juror 3.  DE:552:38–40, 204 ("[W]e will be asking the Court for a specific relief in the form of an inquiry.").  The district court denied these requests — even though Carollo established the fact of Zach Bush's contact with Juror 3, and thus leaving the fact unrebutted.  DE:552:39–40, 204-05.  Instead, the district court instructed Carollo to "***address this with Judge Altman***" in the related "Mad Room" action, apparently for Judge Altman to address there the offense here.  DE:552:39–40 ("[Y]ou can file a motion, whatever you want [to] do ***with Judge Altman*** if, indeed, it is this individual that approached a juror.") (emphasis added).

The district court thus concluded its investigation into potential jury tampering.  Based solely on the limited inquiries of the jurors, the district court found that Zach Bush's threatening contact with Juror 3, and the other jurors' knowledge of that contact, was not "going to impact [the jury]."  DE:552:38.

16

**The district court didn't excuse Juror 3, who eventually became the foreperson**, leading the jury to return the $63.5 million verdict ($12.7 million of which belongs Zach Bush).  *See* DE:569:29; DE:552:9.

### CAROLLO MOVED FOR MISTRIAL

Carollo proposed a curative instruction to the jury that stated the truth regarding Juror 3's extrinsic contact:  Carollo had nothing to do with it.  *See also* DE:413;   DE:438 (proposed instruction and request to file under seal).  This instruction was imperative, argued Carollo, because the theme of Plaintiffs' case was that Carollo was a "bully, a person of power, a person who intimidates," such that the jury would be left with the impression that Carollo may have been the one directing witnesses and jurors to be followed.  DE:552:198.

The district court rejected Carollo's proposed instruction, ruling it was "going to read the [P]laintiffs' instruction which is … a neutral statement."  DE:552:196.  The district court found — without adequate inquiry, because Zach Bush was never questioned about his intentional contact with Juror 3 or his communication with Plaintiffs about it (the video notwithstanding) — that "there was ***no evidence*** that [Plaintiffs] were in communications [with Zach Bush] or [that Zach Bush acted] directly on [Plaintiffs'] behalf."  DE:552:201 (emphasis added).

The district court reiterated that he was not going to order Zach Bush to appear for questioning, stating, "***That's for Judge Altman to deal with***." DE:552:202

17

(emphasis added).  *See also* DE:552:204–05 (Counsel for Carollo again requesting Zach Bush to be brought before the court.)

The district court refused to instruct the jury that Plaintiffs' business partner and litigation-funder contacted Juror 3 — despite this fact being undisputed — because the district court determined that Zach Bush acted "***of his own volition.***"  DE:552:199–204 (emphasis added).[2]

Carollo moved orally for a mistrial (DE:552:196–97, 203), followed by a written motion (DE:397), and a further motion under seal (DE:409, 437, 481). Carollo argued that Zach Bush's contact with Juror 3 was prejudicial because the unauthorized discussions were ***about the case***, and where, as here, "deliberate contact or communication" with a juror about the pending case is established, "***prejudice and harm appears as a matter of law***."  DE:409:4–5 (emphasis added; citation omitted).

The district court denied the motions for mistrial (DE:461), explaining as follows:

> What was done was clear on the record, ***while improper***, nowhere mirrored the same facts and circumstances that's purported by what the defendants raised to grant a mistrial.  And I can tell you ***this Court is not going to waste time with that***.

---

[2] Again, without adequate inquiry, because Zach Bush was never questioned about the contact with Juror 3 or his communication with Plaintiffs about it (the video notwithstanding).

DE:567:131–32 (emphasis added).

### THE DISTRICT COURT PROHIBITED CAROLLO FROM MENTIONING ZACH BUSH FOR THE DURATION OF TRIAL

For the duration of the trial, the district court prohibited Carollo from introducing evidence of Zach Bush (or even mentioning his name), which was necessary to establish the theme previewed in opening statements that Plaintiffs and their associates were the harassers. *See* DE:557:59–68; DE:564:173–77. *See also* DE:546:53 (opening statement).

Indeed, Carollo's Zach Bush-related evidence was listed ***pre-trial***, long before Zach Bush's jury tampering. *See* DE:379. But Carollo was prevented from developing his theme with such duly-noticed evidence (and representation to the jury in the opening statement). The district court's rulings, therefore, far from dispelling any prejudice from Zach Bush's intentional contact with Juror 3, in fact prejudiced Carollo even further, to the direct benefit of the Plaintiffs (and Zach Bush, who earned 20% of the eventual award).

### (2) Failure to Instruct Jury on Probable Cause and Exclusion of Relevant Evidence.

Carollo proposed a jury instruction that ***Plaintiffs*** bore the burden to disprove probable cause for the City's enforcement proceedings against Plaintiffs' LLCs. DE:567:154–59, 168. *See also* DE:445:16–17 (proposed instruction).

19

Plaintiffs actively opposed this instruction. DE:567:157–160. *See also* DE:567:34–35 (Counsel for Plaintiffs arguing that "probable cause doesn't apply"). The Court denied Carollo's requested probable cause instruction. DE567:167–69. And the district court further excluded evidence of probable cause. *E.g.*, DE:566:31–32, 34–35 (preventing Assistant City Attorney Dooley from testifying about the outcome of code enforcement proceedings, including Eleventh Judicial Circuit's appellate panel opinion holding City did not engage in selective enforcement). *See also* DE:251-3 (excluded appellate decision).

**(3) Evidence of Noneconomic Damages.**

Plaintiffs' evidence of noneconomic damages consisted of their own testimony (and that of Fuller's wife) about reputational and emotional harms.

### REPUTATIONAL HARM

Fuller testified that his reputation became "toxic" because of Carollo's statements while on a radio program (despite never mentioning Fuller's name). DE:561:194-195, 198. He lost his transactional attorneys (but that was because of a conflict), a lender stopped doing business with him (because the "liability [was] too great"), and a Cuban heritage museum he wanted to open was "shelved." DE:561:199, 201.

Pinilla similarly testified generally that this was all "devastating to [his] reputation." DE:559:159–160. He recalled that he also had issues with lenders and

banks (but did not provide any specifics) and he had problems launching a rum distillery (due to permitting issues).  DE:559:157–161.

### EMOTIONAL DISTRESS

Fuller testified without elaboration that Carollo "impacted" his "personal relationships," his "family life," and his ability to "function [at his] highest and best Bill."  DE:561:202.  He had "sleepless night[s]" and feelings of paranoia when entering the City.  DE:561:204.  He "[p]robably" suffered from health issues, and could have "be[en] a better husband."  DE:561:203–05.  His wife described him as "sad," "deflated," and "devastated."  DE:558:193, 199-200.

Pinilla stated that he experienced a "heightened level of stress" that "caused [him] to be a different person"; he was no longer "super optimistic," and he had a "short fuse" and a short attention span with his family.  DE:559:166-67.

Based on this unelaborated evidence, of noneconomic damages, the jury awarded $8.6 million to Fuller and $7.3 million to Pinilla in compensatory damages. DE:470.

### (4) Motion for Judgment as a Matter of Law and Ruling.

Carollo moved for judgment as a matter of law, arguing:

- Plaintiffs did not engage in any protected activity under the First Amendment, *their LLCs did*, which were not parties to the action.  DE:455:2-10.

21

▪ Plaintiffs failed to prove a causal link between the allegedly retaliatory conduct and Carollo's animus, in particular because ***probable cause existed for all the City's enforcement actions against the LLCs***. DE:455:11-18.

The district court denied Carollo's motion. DE:568:183.

## G. Post-Trial Motions and Rulings.

### (1) Carollo's Motion for New Trial, Judgment as a Matter of Law, and Remittitur.

#### RE. JUDGMENT AS A MATTER OF LAW (DE:498)

▪ Plaintiffs failed to prove they (not their LLCs) engaged in protected First Amendment activity. DE:498:1–6.

▪ Plaintiffs failed to prove a causal connection between Carollo's purported retaliatory animus and their subsequent injuries. DE:498:4–6.

▪ Plaintiffs failed to quantify their emotional and reputational harms, and thus failed to prove damages. DE:498:6.

#### RE. NEW TRIAL (DE:498)

▪ The district court should have granted a mistrial based upon Zach Bush's jury tampering. DE:498:18–20.

▪ The district court erred in denying an instruction on probable cause, and excluding relevant probable cause evidence. DE:498:16–17.

**RE. REMITTITUR** (DE:499)

Carollo sought a new trial and, alternatively, remittitur of the compensatory damages based on the excessive and unsupported compensatory award of $15.9 million — based on little more than conclusory testimony of Plaintiffs and a single family member.  DE:498:6–8; DE:499:1–4.  And Carollo further sought new trial and remittitur of the shockingly large punitive damages — $47.6 million against a single individual lawmaker.  DE:498:10;  DE:499:5–8.

### (2) The District Court Denied Carollo's Post-Trial Motions.

The district court denied Carollo's Motion for New Trial and Renewed Motion for Judgment as a Matter of Law, and Motion for Remittitur, and in its order included gratuitous commentary on Carollo's alleged conduct, rather than the damages award itself:

> Next, Defendant argues that the damages awarded are so grossly excessive that they shock the conscience. The Court disagrees. The only shock to the conscience here is that Defendant used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent.

DE:631:7 (emphasis added).

23

## STATEMENT OF THE STANDARD OF REVIEW

The court "review[s] the denial of a motion for a new trial based on the jury's exposure to extrinsic evidence" and the "denial of a motion for mistrial for abuse of discretion." *U.S. v. Ronda*, 455 F. 3d 1273, 1296 n.33 (11th Cir. 2006) (citing *U.S. v. Martinez*, 14 F. 3d 543, 547 (11th Cir. 1994) and *U.S. v. Ramirez*, 426 F.3d 1344, 1353 (11th Cir. 2005)).  But where, as here, "a reasonable probability exists that extrinsic matters influenced the jury's deliberations … the district court abuse[s] its discretion [by] den[ying] [a] motion for a mistrial." *Martinez*, 14 F.3d at 552.  And a "district court by definition abuses its discretion when it makes an error of law," such as failing to apply the correct burdens. *AcryliCon USA, LLC v. Silikal GMBH & Co.*, 46 F.4th 1317, 1324 (11th Cir. 2022) (citing *Quintana v. Jenne*, 414 F.3d 1306, 1309 (11th Cir. 2005))

This Court reviews "de novo the denial of a motion for judgment as a matter of law, and, in applying the same standard as the district court, … view[s] all facts, by whomever presented, in a light most favorable to the nonmoving party." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1154 (11th Cir. 2002).  And "[w]hether a plaintiff engaged in speech protected by the First Amendment is a question of law," also reviewed de novo. *Id.* at 1155.  *See also Morris v. Crow*, 117 F.3d 449, 455 (11th Cir. 1997) ("whether … activities are protected speech is a question of law, which this Court reviews de novo").

24

And this Court "review[s] the denial of a motion for remittitur or new trial under an abuse of discretion standard." *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013).

## SUMMARY OF ARGUMENT

The fact that the Plaintiffs were awarded over $60 million against a single city commissioner is the byproduct of a cascade of errors that began with the reasonable probability that the Plaintiffs' (or close associates) tampered with the jury and concluded with the tampered juror at the forefront of the runaway verdict. Along the Plaintiffs' road to perdition are three issues of law addressed in this brief that explain the reasons for the unprecedented and disproportionate jury award. Though the issues are interrelated, each individually requires reversal of the district court's final judgment and, at the very least, a new trial.

### The District Court Failed to Dispel the Presumption of Jury Tampering.

The district court abdicated its responsibility to fully vet the jury tampering when it was unequivocally established that Zach Bush (Plaintiffs' business partner who had a pecuniary interest in the legal proceedings) directly contacted Juror 3 in a parking garage elevator, and the encounter left her "scared." And, Juror 3 talked about it with other jurors. Prejudice to the fairness of trial is presumed in such circumstance, and the district court must make an adequate inquiry into the circumstances and thereon determine whether to grant a mistrial. That was not done here. The district court stopped at the point where the presumption was established, and without questioning Zach Bush, denied a mistrial and allowed the proceeding to go forward with the tampered jury. Compounding the abdication of responsibility

26

to get to the bottom of the jury tampering, the district court precluded mention of Zach Bush at trial, thought he was central witness to Carollo's case — championing his own misconduct to the detriment of Carollo. Given that the Plaintiffs proceeded to court on a nebulous claim, the prejudice and taint cannot be cleansed.

**Carollo Was Entitled to a Judgment as a Matter of Law Because the Plaintiffs Failed to Prove their Claim in these Material Ways:**

a. Carollo did not act under the color of the law when he reported to code inspectors that the Plaintiffs were violating the City's building code nor when he allegedly made false and defamatory statements regarding the Plaintiffs. Even if the Plaintiffs proved that Carollo engaged in such activity, those actions were not made possible only because Carollo was clothed with the authority of state law. They cannot form the basis of a section 1983 claim.

b. Plaintiffs failed to prove that they individually engaged in constitutionally protected speech: all the political support came from their companies — entities with separate and distinct rights.

c. The Plaintiffs' injuries were all self-inflicted: Plaintiffs failed to show the absence of probable cause for the City's code enforcement actions to establish Carollo's alleged animus caused the Plaintiffs' injuries.

**The Damages were Grossly Excessive and Warrant a New Trial.** The unprecedented and shockingly large compensatory damages and punitive damages

27

awards solidify the presumption that the jury was not acting as an impartial decision maker presiding over the Plaintiffs' reed-thin claims.

In sum, the jury's verdict represents nothing more than the Plaintiffs' most recent flouting of our systems of governance. The Plaintiffs' weaponization of the judicial system — turning crocodile tears over their own building code violations into a $60 million judgment against Carollo — should not be countenanced.

## ARGUMENT

### I.   THE DISTRICT COURT FAILED TO DISPEL THE PRESUMPTION OF PREJUDICE THAT ATTACHED DUE TO EVIDENCE OF JURY TAMPERING BY PLAINTIFFS' BUSINESS PARTNER.

#### A.   The Governing Standard.

Where, "a ***reasonable probability*** exists that extrinsic matters influenced the jury's deliberations, … the district court abuse[s] its discretion [by] den[ying] [a] motion for a mistrial." *Martinez*, 14 F.3d at 552 (emphasis added).

"As a matter of established law, … ***prejudice is presumed*** the moment the defendant establishes that 'extrinsic contact with the jury in fact occurred.'" *Martinez*, 14 F.3d at 550 (emphasis added) (quoting *U.S. v. Caporale*, 806 F.2d 1487, 1503 (11th Cir. 1986)).  As this Court stated:

> The lineage of this rule runs deep in Supreme Court jurisprudence: "Private communications, possibly prejudicial, between jurors and third persons . . . are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear." *Mattox v. U.S.*, 146 U.S. 140, 150, 36 L. Ed. 917, 13 S. Ct. 50 (1892).  More recently, the Court reaffirmed this rule with emphatic clarity:
>
>> In a criminal case, ***any private communication*** [or] contact . . . directly or indirectly, with the juror during a trial about the matter pending before the jury is, for obvious reasons, deemed ***presumptively prejudicial***, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.
>
> *Remmer v. U.S*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (emphasis added).  *See also U.S. v. Spurlock*, 811 F.2d 1461, 1463 (11th Cir. 1987) (adopting *Remmer* standard of presumptive prejudice).

*Martinez*, 14 F.3d at 550 (emphasis added).

Under the *Remmer* standard, therefore, "[o]nce the defendant proves extrinsic contact, the ***burden shifts to the [plaintiff]*** to demonstrate that the consideration of the evidence was harmless." *Id*. (emphasis added). *See also Ronda*, 455 F.3d at 1299 ("Once the defendant establishes that such exposure in fact occurred, prejudice is presumed and the burden shifts to the government to rebut the presumption.").

Indeed, as this Court recently reemphasized, "[o]ne touchstone of a fair trial is an impartial trier of fact — a jury capable and willing to decide the case solely on the evidence before it." *Fylling v. Royal Caribbean Cruises, Ltd.*, 91 F.4th 1371, 1375 (11th Cir. 2024) (internal citations and quotation marks omitted).

Where there are "colorable claims of juror bias … ***the trial judge <u>must</u>*** develop the factual circumstances sufficiently to make an informed judgment." *Id*. at 1375–1376 (emphasis added, citations omitted). "[A] district court's obligation to protect the right to an impartial jury does not end when the jury is impaneled and sworn." *Id*. at 1376. "Due process means a jury capable and willing to decide the case solely on the evidence before it, ***and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen***." *U.S. v. Rowe*, 906 F.2d 654, 656 (11th Cir. 1990) (emphasis added, citations omitted).

Due process, therefore, requires the district court to conduct a fulsome inquiry into "the totality of the circumstances surrounding the introduction of extrinsic evidence" or the extent and effect of "extrinsic contacts." *Ronda*, 455 F.3d at 1299– 1300. *See also Port Terminal & Warehousing Co. v. John S. James Co.*, 695 F.2d 1328, 1341 (11th Cir. 1983) ("We do require that the trial court determine whether the jury misconduct occurred and whether or not it was clearly prejudicial."). *Accord U.S. v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021) ("A judge's bobtailed inquiry into juror bias flunks the constitutional test that the investigation be reasonably calculated to resolve doubts raised about the juror's impartiality") (internal citations omitted).

## B. The Undisputed Evidence of Jury Tampering by Plaintiffs' Business Partner, Zach Bush.

Plaintiffs did not dispute that there was extrinsic juror contact, nor did they dispute that Zach Bush — their business partner and litigation funder — was the one who made the juror contact.

Juror 3 reported that Zach Bush told her he was following her, and then warned her that witnesses had been followed during this trial, suggesting that she look up that fact on "social media." DE:552:8–10, 19–23. Juror 3 then reported this incident not only to the district court, but to Jurors 2, 5, 6, 7, 8, and 9. DE:552:19– 23, 25–33. Juror 3's report was uncontradicted (indeed, the district court did not order Zach Bush to answer for his violation of court orders).

Furthermore, Carollo provided uncontradicted evidence of Zach Bush's intent to tamper: sworn testimony from the Mad Room action in which Zach Bush admitted he was "***vested in the outcome***," due to his direct 20% stake in the $63.5 million verdict (about $12.7 million). DE:552:196–97. DE:425-3 (emphasis added).

Because Carollo "establishe[d] that such exposure" between Plaintiffs' business partner, Zach Bush, and Juror 3 "in fact occurred, prejudice [became] presumed and the burden shift[ed] to the [Plaintiffs] to rebut the presumption." *Ronda*, 455 F.3d at 1299.

### C.  The District Court Failed to Discharge Its Duty to Safeguard the Jury Process by Refusing to Question Zach Bush.

Factors relevant to determining "whether the [plaintiff] has rebutted that presumption" of prejudice include:

    1)    "the nature of the extrinsic evidence" or contact,

    2)    "the manner in which the information reached the jury,"

    3)    "the factual findings in the district court and the manner of the court's inquiry into the juror issues,"

    4)    "the strength of the [plaintiff's] case."

*Ronda*, 455 F.3d at 1300. *Accord Martinez*, 14 F.3d at 550 (explaining "the heavy burden on the government" to rebut the presumption of prejudice).

Starting with the third factor, the manner of the district court's inquiry stopped far short of developing a factual record to rebut prejudice. To be sure, the court

questioned Juror 3 about the incident, and gauged the remaining jurors' exposure through a brief voir dire — but this was only half of the story.

The other half remains shrouded in mystery because the district court denied Carollo's repeated requests to order Plaintiffs' business partner, Zach Bush (who had attended every day of trial until that point), to appear for questioning. DE:552:38–40, 204–05. Instead, the district court dismissed Zach Bush's undisputed contact with Juror 3 as a problem for Judge Altman, who presided over the "Mad Room" case. DE:552:202 (The Court: "[T]o be clear, again, *if you see this person*, whoever it is, it has not been brought before this Court. *If you see him*, let me know. … To my understanding, he may be a witness in the other case. *That's for Judge Altman to deal with*.") (emphasis added); DE:552:38–39 (The Court: "If, indeed, if it is this individual, I'm sure *you should address this with Judge Altman*. You can bring that up, too. I can, of course, inquire, and if indeed this particular person, you can file a motion, whatever you want do *with Judge Altman* if, indeed, it is this individual that approached a juror.") (emphasis added).

The district court, despite finding that Zach Bush indeed engaged in "improper communication" with a juror, refused to discharge his duty to order Zach Bush to appear, instead merely suggesting that if he came "back before this Court" — of his own volition — the court would "address it accordingly." DE:564:174. *See also* DE:552:204–05 (The Court: "Since we gave this instruction, I haven't seen

him [Zach Bush]. *If you see him tomorrow*, by all means, please bring it to my attention.") (emphasis added).

And yet, despite never questioning Zach Bush, the district court somehow purported to make findings of fact that Zach Bush was a rogue actor, and that Plaintiffs were not involved in the extrinsic contact — that "both parties had nothing to do with it"; that "there was no evidence that they [Plaintiffs] were in communications or directly on his behalf [sic]"; and that Zach Bush decided to tamper with a juror "of his own volition." DE:552:200–04. There was no factual predicate for these "findings."

To be clear, there was "no evidence that the[] [Plaintiffs] were in communications with" Zach Bush regarding juror tampering *because* the district court refused to discharge its duty to question the tampering Zach Bush. The district court's "bobtailed inquiry into" juror tampering by Plaintiffs' business partner, Zach Bush — an investor in the litigation with a direct financial stake in the $63.5 million verdict — "flunks the constitutional test" under *Remmer*. *Lanier*, 988 F.3d at 295.

Thus, because "the factual findings in the district court" were unsupported and "the manner of the court's inquiry into the juror issues" demonstrated a total failure to ensure the integrity of the jury trial, reversal and remand for a new trial is required. *Ronda*, 455 F.3d at 1300.

**D. Plaintiffs Failed to Rebut the Presumption of Prejudice Due to the Nature of the Contact, the Manner it Reached the Jury, and the Weakness of Plaintiffs' Case.**

The remaining factors further demonstrate Plaintiffs failed to carry their "heavy burden" to rebut prejudice.

Consider the "nature of the extrinsic evidence" and "the manner in which [it] reached the jury." *Ronda*, 455 F.3d at 1300. Juror 3 was followed by Zach Bush into an empty parking garage and while alone together in an elevator, Zach Bush stated he was following the juror. DE:552:8–10. Zach Bush warned Juror 3 she should be careful because a witness who testified the previous week was being followed, and entreated Juror 3 to violate the district court's instructions by confirming this on social media. *Id*.

This encounter "scared" Juror 3, who reported the incident to her fellow jurors, stating that she was "uncomfortable." DE:552:23, 30–31.

After Zach Bush made this contact with Juror 3, he continued to appear at trial, where Juror 3 continued to see him. DE:552:20.

The prejudice presumed from this improper contact was further amplified by the fact that Juror 3 was not excused, but, in fact, went on to become ***the foreperson*** of a jury that rendered a verdict for $63.5 million. *See* DE:470; DE:569:29; DE:552:9. *Contra Rowe*, 906 F.2d at 656 (prejudice sufficiently rebutted where district court dismissed jurors exposed to extraneous evidence); *U.S. v. Gabay*, 923

F.2d 1536, 1542–1544 (11th Cir. 1991) (prejudice rebutted where tainted juror who discussed case with coworkers was excused); *Ronda*, 455 F.3d at 1297 (prejudice rebutted where district court dismissed juror whose house was burglarized, and who suspected it was related to the trial).

Moreover, after Zach Bush's tampering, the district court precluded Carollo from even mentioning the name "Zach Bush," even though he was an integral member of Plaintiffs' business enterprise, had been listed as a witness by Plaintiffs before trial, and was presented in opening statement as a feature witness at trial. *See* DE:557:59–68; DE:564:173–77. *See also* DE:379. In their opening statement, defense counsel even showed a video of Zach Bush, in which he was harassing Carollo and a constituent, and counsel told the jury that a theme of the defense would be "who was harassing who?" DE:546:53. But after Zach Bush tampered with the jury and the district court precluded any reference to him, Carollo was barred from presenting evidence he promised the jury he would introduce.

And, within the context of Plaintiffs allegations that Carollo threatened and intimidated City employees and others to target and retaliate against Plaintiffs, the district court's failure to give a curative instruction making it clear that "this contact had nothing to do with Defendant, Commissioner Joe Carollo, and the contact is not directly or indirectly associated with Commissioner Carollo," left a false impression

with the jury members that Carollo may have been behind the tampering. *See* DE:498. See also DE:413, DE:438.

At bottom, the unrebutted prejudice to Carollo manifested as a $63.5 million verdict (of which, the tampering Zach Bush is entitled to 20%, or $12.7 million, *see* DE 425-3).

Reversal and remand for a new trial is required based on the unrebutted presumption of prejudice that attached to this verdict due to Plaintiffs' business partner's jury tampering. Indeed, as discussed more fully below, Carollo was entitled to judgment as a matter of law, and so "the strength of the [Plaintiffs'] case" cannot cleanse the taint of jury tampering. *Ronda*, 455 F.3d at 1300. *E.g.*, *Martinez*, 14 F.3d at 552 ("Because the government's evidence was not overwhelming, we conclude that a reasonable probability exists that extrinsic matters influenced the jury's deliberations and that the district court abused its discretion when it denied [defendant's] motion for a mistrial.")

## II.   CAROLLO WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

### A.   Plaintiffs Failed to Prove Carollo Acted Under Color of Law Because there Was No Evidence that Carollo's Actions Were Made Possible Only Because of His Authority as Commissioner.

To prove "a claim for First Amendment retaliation under § 1983," a plaintiff must prove:

1)  "that the plaintiff engaged in constitutionally protected speech,"

2) "that the defendant's retaliatory conduct adversely affected the protected speech," and

3) "that the retaliatory action caused the adverse effect on plaintiff's speech."

*Turner v. Williams*, 65 F.4th 564, 579 (11th Cir. 2023) (citation omitted).

Moreover, the plaintiff must prove that the government official deprived the plaintiff of Constitutional rights "under color of any statute, ordinance, regulation, custom, or usage, of any State…." 42 U.S.C. § 1983 (2018).

This Court has explained that Section 1983's color-of-law requirement limits actionable wrongdoing to acts that are "made possible *only*" through exercise of those specific powers granted to the state official:

> *[N]ot all wrongful acts by state employees are acts under color of law*. Rather, section 1983 seeks to prevent misuses of power "*made possible* only because the wrongdoer is clothed with the authority of state law[.]"

*Walker v. Dixon*, 840 Fed. Appx. 397, 400–401 (11th Cir. 2020) (emphasis added; internal citations omitted).

"The Supreme Court has defined 'acting under color of law' as acting with power possessed *by virtue of the defendant's employment* with the state." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522–23 (11th Cir. 1995) (emphasis added) (citing *West v. Atkins*, 487 U.S. 42, 49 (1988)) (dismissing disparate treatment claims under Title VII, § 1983, and the Fourteenth Amendment). Thus, "[t]he dispositive issue is whether the official was acting *pursuant to the power he/she possessed by*

*state authority* or acting only as a private individual." *Id*. (internal citation omitted) (emphasis added).

As a City Commissioner, Carollo's "power … possessed by state authority" was derived from and circumscribed by the City Charter. Carollo was a single member of a collective legislative body, the City Commission, which can pass ordinances and adopt regulations. § 4(a), Charter of the City of Miami, *available at* https://library.municode.com/fl/miami/codes/code_of_ordinances?nodeId=PTICHRE LA_SPATHCH_S1CREX. DE:506-4:3–55; DE:547:136–45. Individual commissioners are further empowered to conduct legislative inquiries to inform the exercise of their power to pass ordinances. §§ 4(d) & (f).

But the City Charter withholds from an individual commissioner the power to remove or appoint the City Manager's subordinates, and precludes commissioners from directing the City Manager's subordinates to take action. *See* § 4(d).

These limited powers granted to an individual commissioner were not implicated by Plaintiffs' allegations of retaliation. Indeed, the jury was instructed to consider ***only*** the following specific acts of retaliation:

(1) "[T]respassing and lodging fabricated and often anonymous complaints";

(2) "[C]ausing or commandeering City [] officials to selectively target [Plaintiffs] or properties, businesses, tenants or events associated with them for inspections, violations, and enforcement actions"; and

(3) "[M]aking false and defamatory statements to harm" Plaintiffs.

DE:475:7–8.

The first and third acts are, on their face, plainly not "pursuant to the power [Carollo] possessed by state authority" under the City Charter. *Edwards*, 49 F.3d at 1522–23. While trespassing may be a tort or crime (and, it should be noted, Plaintiffs never instructed the jury on the elements of this specific crime, nor was there any evidence supporting the elements), "not all wrongful acts by state employees are acts under color of law." *Walker*, 840 Fed. Appx. at 400–401.

Carollo "did not act under color of law when he reported to [code inspectors] that [Plaintiffs were in violation of the building code] because, in reporting the [violations], he 'act[ed] only as a private individual,' and not "in his official capacity or ***while exercising his responsibilities pursuant to state law***." *Myers v. Bowman*, 713 F.3d 1319, 1330 (11th Cir. 2013) (quoting *Edwards*, 49 F.3d at 1523 & *West*, 487 U.S. at 50) (emphasis added). Reporting code violations is not a "power possessed by virtue of the defendant's employment with the state" — ***any*** resident may report suspected code violations. *Edwards*, 49 F.3d at 1522–23 (quoting *West*, 487 U.S. at 49). And to be sure, lodging ***anonymous*** complaints is the opposite of abusing one's position within government — Carollo reporting violations ***without identifying himself***, renders his official position unknown, and thus irrelevant.

40

As for the purported defamatory statements, it cannot be overlooked that Plaintiffs failed to bring a claim for defamation under Florida law.  In any event, "Section 1983 does not federalize all torts or other deprivations of rights committed by a person who is a law enforcement officer or other government agent."  *Myers*, 713 F.3d at 1329 (quoting *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012)).  Carollo did not draw upon the powers granted him in the City Charter to speak about Plaintiffs.

This leaves only the second alleged act of retaliation:  "commandeering City [] officials to selectively target [Plaintiffs]."  DE:475:7–8.  But this also fails to satisfy the color-of-law requirement:  the City Charter expressly ***withholds from commissioners*** the power to direct City officials or employees.  Thus, assuming for purposes of argument that Carollo did direct employees to take specific action, such directions or orders would ***not*** have been "'made possible ***only*'* because of his authority as" a City Commissioner, *Walker*, 840 Fed. Appx. at 402 (quoting *Butler*, 685 F.3d at 1268), to attend and participate in commission meetings "to pass ordinances adopt regulations."  § 4(a) of the City Charter.

In *Walker*, this Court affirmed the district court's dismissal of a Section 1983 claim alleging violations of substantive due process rights under the Fourteenth Amendment.  840 Fed. Appx. at 398.  A county elections supervisor was sued by his wife and daughter, who alleged that the elections supervisor "used his authority to

impede investigations into crimes, allowing him to keep abusing" plaintiffs for years. *Id*. at 399. The district court — and this Court — concluded that, although criminal and morally reprehensible, the elections supervisor's abuse of his family was not made possible "pursuant to his powers as the county elections supervisor" — nor was his obstruction of the investigations. *Id.* at 399, 402.

Thus, *Walker* stands for the proposition that where a government defendant leverages his "cooperative relationship with and influence over local officials" to affect the outcome of an investigation, such an allegation fails the color of state law requirement. *Id*. at 401. In other words, although favorable relationships and influence may derive from a defendant's ***status*** as an elected official, a defendant's exercise of that influence is not the same as exercising power expressly granted to him under state law.

Even where the tools of the defendant's wrongful act are government property, this Court has held that the defendant's acts were not "made possible only because [the defendant] was clothed with the authority of state law." *Butler*, 685 F.3d at 1268–69. In *Butler*, the defendant was a state corrections officer who, while in uniform and with officially issued handcuffs and a firearm, assaulted her daughter's lover. *Id*. at 1263. This Court held that, although the defendant "was an angry parent who happened to be in uniform, have handcuffs, and a firearm, which she used for the private ends of assaulting and scaring a young man she caught in

bed with her daughter," her actions were not "made possible only because [she was] clothed with the authority of state law." *Id*. at 1268-69. Crucially, "[a]ny other angry parent with a firearm in the house could have done what [defendant] did." *Id*.

Here, even if Carollo used his influence as a City Commissioner to direct action against Plaintiffs, any other resident (family members, friends, etc.) could have exerted influence to direct City employees to act. This Court's decision in *Butler* teaches that even when the instrumentality of alleged wrongdoing is possessed through an official government position — here, influence — that does not amount to "exercise of ***authority*** that [defendant] has by virtue of h[is] government office or position." 685 F.3d at 1265 (emphasis added).

Here, the allegation is that Carollo acted ***contrary to,*** not consistent with, his authority under the City Charter, and that he exercised his influence with the City Manager and subordinates to selectively target Plaintiffs. But based on this Court's precedent Court, and Supreme Court precedent too, that's not actionable state conduct under Section 1983. *Walker*, 840 Fed. Appx. at 402; *Butler*, 685 F.3d at 1268–69; *West*, 487 U.S. 42.

Without an empowering source of state law for Carollo's actions, whatever actions the City employees took with respect to Plaintiffs is irrelevant. "The primary focus of the color of law analysis must be ***on the conduct of the defendant***, not the victim or a third-party, and the record does not support the conclusion that [Carollo]

43

acted pursuant to the power he possessed by state authority." *Myers*, 713 F.3d at 1331 (emphasis added, internal citations, quotation marks, and brackets removed).

Because Plaintiffs failed to plead or prove that Carollo acted under color of state law, judgment should have been entered in his favor.

### B. Plaintiffs Produced <u>No</u> Evidence that they Engaged in Protected Activity.

#### (1) Non-Party LLCs Engaged in Speech — Plaintiffs Did Not.

Plaintiffs alleged that they "exercised their right to free speech and free association by supporting Leon in the run-off election and hosting a rally for Leon on Plaintiffs' property." DE125:53 (emphasis added).

But Plaintiffs failed to produce evidence that ***they individually*** "engaged in constitutionally protected speech." *Turner*, 65 F.4th at 579. Instead, they proceeded on a theory that the non-party LLCs, in which they had membership interests, engaged in protected speech which resulted in retaliation against other LLCs.

Thus, the evidence at trial was undisputed: the protected conduct forming the basis of the claims submitted to the jury was that of the non-party LLCs, not Plaintiffs. The jury instructions asked whether Plaintiffs were retaliated against for "supporting Carollo's opponent in a run-off campaign through [i] speech, [ii] campaign donations, and [iii] holding political rallies on property associated with them." DE:475-7.

Consider the evidence on each alleged instance of speech or conduct.

*First*, Plaintiffs did not support Carollo's opponent through speech, because they chose not to broadcast any supportive speech publicly. Plaintiffs did not place their names on any promotional materials or signs for the rallies. DE:560:186. *See also* DE:558:189; DE:559:222–23. And Plaintiffs testified that they intended to avoid conveying any political messages to the public. *See* DE:558:189; DE:559:222–23; DE:560:171, 174, 189–90; DE:561:50. Although Pinilla claimed to have attended the rallies, his presence alone is not evidence that he adopted the speech of the rally organizers. *See Gathright v. City of Portland, Or.*, 439 F.3d 573, 577–578 (9th Cir. 2006) (mere presence at public event not adoption of organizer's message for First Amendment purposes). There is no dispute that Fuller did not attend either of the rallies. DE:560:187.

Thus, Plaintiffs failed to engage in conduct that was inherently "expressive" and thus protected by the First Amendment. *Zinman v. Nova SE. Univ., Inc.*, 2023 U.S. App. LEXIS 7402, *14-15, 2023 WL 2669904 (11th Cir. Mar. 29, 2023) (inherently expressive conduct requires "intent to convey a particularized message" and "the likelihood must be great that the message would be understood by those who viewed it"). *See also*, *e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65–66 (2006) (host accommodating speech of another is not inherently expressive conduct).

45

*Second*, Plaintiffs did not support Carollo's opponent through donations — the non-party LLCs did. DE:559:217–19. *See also* DE:506-16:1–45 (Alfie Leon Campaign Treasurer's Report). And, of course, Plaintiffs cannot claim constitutional protections in conduct that would otherwise be illegal: Florida law prohibits an individual from contributing to a campaign, directly or indirectly, ***in the name of another***. *See* § 106.08, Fla. Stat. (2023).

*Third*, Plaintiffs did not hold or host any rallies, the LLCs did. DE:559:52–53, 221–23. And Plaintiffs did not own the properties on which the rallies took place — the LLCs did. *Id.* "A member of a limited liability company has ***no interest*** in any specific limited liability company property." § 605.0110, Fla. Stat.

As for the "ethics complaint against Carollo" (DE:475:7), this was Barlington Group's speech, not Fuller's. DE:506-15:48. Fuller admitted at trial that he "filed it ***on behalf of*** the Barlington Group." DE:563:20 (emphasis added). Thus, while Fuller's name appeared on the ethics complaint, it was as an agent for Barlington Group, not as Fuller individually. *Cullum v. Packo*, 947 So. 2d 533, 536 (Fla. 1st DCA 2006) ("An agent both speaks on behalf of and binds the principal."). ***Barlington Group's speech***, in the form of the ethics complaint cannot, as a matter of law, be attributed to Fuller.

In sum, none of the speech the jury was instructed to consider was the *Plaintiffs'* protected speech. DE:475:7. Reversal and remand for entry of judgment in Carollo's favor is warranted.

### (2) Members Cannot Sue Based on their LLC's Speech.

It was also irrelevant that Plaintiffs held interests in the LLCs that engaged in the identified speech. This did not confer on Plaintiffs any standing to bring a First Amendment retaliation claim on behalf of the non-party LLCs.

The "shareholder standing rule is either a cousin or direct descendant of th[e] prudential limitation" on standing "that 'the plaintiff … cannot rest his claim to relief on the legal rights or interests of third parties.'" *Oakes Farms Food & Distribution Services, LLC v. Sch. Dist. of Lee Cnty., Florida*, 541 F. Supp. 3d 1334, 1342 (M.D. Fla. 2021) (*quoting Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Because First Amendment rights are personal — accruing only to those individuals that exercised the rights — the shareholders and members of corporate entities may not redress violations of their entities' First Amendment rights. *See Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938) ("Freedom of speech and freedom of the press… are among the fundamental *personal* rights and liberties which are protected by the Fourteenth Amendment from invasion by state action.") (emphasis added). *Accord, e.g.*, *Colonies v. County of San Bernardino*, 2020 U.S. Dist. LEXIS 160672, *78-79, 2020 WL 5102160 (C.D. Cal. July 28, 2020)

("Plaintiffs cannot assert retaliation claims based on one-another's protected conduct, even if it is harmed by the asserted retaliation.").

Plaintiffs, therefore, could not vindicate the First Amendment rights of non-party entities in which they own an interest. *See Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981) ("a stockholder cannot maintain an action under the Civil Rights Act for damages suffered by a corporation in which he owns shares").

### C. Plaintiffs Failed to Produce Evidence of a Causal Connection Between the Retaliatory Animus and Their Purported Injuries (Probable Cause Supported the City's Enforcement Actions).

For the third prong of a First Amendment retaliation claim, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citation omitted). "[T]he motive must cause the injury." *Id.* And, "it must be a 'but-for' cause, meaning that the adverse action against the plaintiff ***would not have been taken absent the retaliatory motive***." *Id.* (emphasis added).

"The Supreme Court has recognized that retaliatory animus by a governmental actor is a subjective condition that is '***easy to allege and hard to disprove***.'" *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019) (quoting *Nieves*, 139 S. Ct. at 1725) (emphasis added). For that reason, where — as here — the plaintiff alleges "the governmental defendant has utilized the legal system to … prosecute the plaintiff," the Supreme Court has "require[d] the ***plaintiff***

48

to plead and prove an ***absence*** of probable cause as to the challenged retaliatory …
prosecution in order to establish the causation link between the defendant's
retaliatory animus and the plaintiff's injury." *Id.* (emphasis added) (citing *Hartman
v. Moore*, 547 U.S. 250, 260–61, 265–66 (2006)).

The Supreme Court in *Hartman* explained that it was appropriate to burden
the plaintiffs to ***disprove*** probable cause in cases of retaliatory prosecution because
in such cases the causal connection "is not merely between the retaliatory animus of
one person and that person's own injurious action, but between the retaliatory
animus of one person," the defendant, "and the action of another," the prosecutor.
547 U.S. at 262. Thus, the absence of probable cause is necessary in such cases to
"bridge the gap between the nonprosecuting government agent's motive and the
prosecutor's action, and to address the presumption of prosecutorial regularity." *Id.*
at 263. The Supreme Court in *Hartman* concluded that the "absence of probable
cause" is "***an element*** of a plaintiff's case." *Id.* at 265–66 (emphasis added).

This Court applied *Hartman* to cases of alleged retaliatory civil litigation in
*DeMartini*. This Court reasoned:

> In a First Amendment claim predicated on a retaliatory civil lawsuit by
> the government, the causation landscape is akin to that in *Hartman*
> because an attorney (whether in-house or outside counsel) has filed the
> underlying civil lawsuit. …. ***The involvement of counsel widens the
> causation gap between any alleged retaliatory animus*** by the Town
> and DeMartini's injury. ***Counsel's pivotal role in advising the Town
> that it had a good faith basis to sue supports a requirement that***

> *DeMartini show the absence of probable cause for the Town's underlying lawsuit in order to establish that the Town's alleged animus caused DeMartini's injury*.  Like the prosecutor in *Hartman* who filed the criminal action, the individuals recommending and filing the civil lawsuit here (counsel) were not the same individuals who allegedly harbored the retaliatory animus (the Town's Commissioners).

*DeMartini*, 942 F.3d at 1304 (emphasis added).

Like the alleged retaliatory civil suit in *DeMartini*, Plaintiffs here alleged that Carollo initiated retaliatory "inspections, violations, and enforcement actions" against "properties, businesses, tenants, or events associated with them."  DE:475:7 (Jury Instructions).  Like the civil action in *DeMartini*, the City's enforcement proceedings were brought and maintained by the City attorney and its assistant attorneys.   *See*,   *e.g.*,   DE:556:182–83,   187–88;   DE:565:137,   168–70,   235; DE:566:25–29,  47–58, 60, 150–55, 198–99.  Thus, "[t]he ***involvement of counsel widens the causation gap*** between any alleged retaliatory animus by" Carollo, and the Plaintiffs' injury.  942 F.3d at 1304.

Accordingly, Plaintiffs bore the burden to "show the absence of probable cause for the [City's] underlying [code enforcement actions] in order to establish that [Carollo's] alleged animus caused [Plaintiffs'] injur[ies]."  *Id*.  *See also Bey v. City of Tampa Code Enf't*, 607 Fed. Appx. 892, 896 (11th Cir. 2015) (plaintiff failed to state a claim for retaliatory prosecution of municipal code where she failed to plead "that she had applied for and was denied the permits, that she was not actually

required by the ordinances to obtain the permits, or that she corrected the code violations prior to the code enforcement hearing").

Carollo requested an instruction to accurately reflect that probable cause was "an element of … [P]laintiffs['] case." *Hartman*, 547 U.S. at 265–66. DE:567:154–59, 168. Plaintiffs ***opposed*** this instruction, taking the unsupported position that "probable cause doesn't apply." DE:567:34–35. *See also* DE:567:157–160. Plaintiffs, therefore, affirmatively abandoned an element of their case. Accordingly, Plaintiffs' failure even to attempt to disprove probable cause requires reversal and remand for entry of judgment as a matter of law.[3]

Having invited the district court to relieve them of their burden to prove "an element of [their] case," *Hartman*, 547 U.S. at 265–66, Plaintiffs cannot argue now, for the first time on appeal, that there was an absence of probable cause.

Nor will the record permit such an argument. Ample evidence fortified the "longstanding presumption of regularity accorded to prosecutorial decisionmaking" that attached to the City Attorney's decision to prosecute the many code violations against Plaintiffs. *DeMartini*, 942 F.3d at 1291.

---

[3] The district court's failure to give the correct instruction is itself reversible error. *U.S. v. Mayweather*, 991 F.3d 1163, 1183 (11th Cir. 2021) ("the charge as a whole must accurately reflect the law in the context of a case's facts") (internal quotations and brackets omitted).

Assistant City Attorney Dooley testified to her substantial due diligence and discretionary decision making before enforcing the citations. *See* DE:566:56–57 ("If there is [legal sufficiency for a code violation], we move forward, and if there isn't, we don't."); DE:566:37 ("Well, as I said with all cases that come to me as the person who handles the code enforcement prosecutions, I meet with Building, Zoning, Code, whoever is necessary"); DE:566:28–29 ("[T]he cases are brought by, in this case, the Code Compliance. We always do a prehearing beforehand. We see the Notice of Violation, you go through it.").

Assistant City Attorney Goldberg likewise testified to his independent decision making when prosecuting code violations against properties owned by the non-party LLCs. *See*, *e.g.*, DE:565:137, 168–70. Moreover, the City Attorney's office consulted with many different departments and City employees before deciding whether to proceed with enforcement. DE:566:62–63. These employees performed their own investigations and made their own determinations about violations. *E.g.*, DE:565:146–47; DE:566:172–73, 176–81.

And crucially, Assistant City Attorney Dooley, Assistant City Attorney Goldberg, City Manager Noriega, and code enforcement personnel consistently and uniformly testified that they never received any direct orders from anyone, ***including Carollo***, related to the enforcement proceedings. DE:566:52–54 (Dooley);

DE:565:143–44; 148 (Goldberg);    DE:566:267–68 (Noriega);    DE:556:150–52 (Diez); DE:564:90 (Marrero); DE:564:247 (Salvatierra); DE:565:29, 34 (Lugo).[4]

In sum, and although it was not Carollo's burden, ample proof existed supporting the City's probable cause for its code enforcement actions against the non-party LLCs. *See Myers v. Bowman*, 713 F.3d 1319, 1326 (11th Cir. 2013) ("Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity, and even seemingly innocent activity can provide the basis for probable cause." (cleaned up)).   The testimony of the Assistant City Attorneys and inspectors all confirmed the yawning "gap between the nonprosecuting government agent's [Carollo's] motive and the prosecutor's action." *Hartman*, 547 U.S. at 263.

Plaintiffs failed to carry (or even attempt) their burden to disprove probable cause.   Ample record evidence demonstrated that the City had probable cause. Because Plaintiffs failed to prove "an element of [their] case," *Hartman*, 547 U.S. at 265–66, judgment should have been granted in Carollo's favor.   Reversal and remand is required.

---

[4] One additional, decisive piece of evidence on probable cause was an opinion from the Eleventh Judicial Circuit's appellate panel, which affirmed one code enforcement proceeding against a non-party LLC, and specifically found that there had been no selective enforcement against Plaintiffs.  DE:279-2.  But the district court excluded this decision.  *See* DE:566:31–35.

### III.    THE GROSSLY EXCESSIVE DAMAGES WARRANT A NEW TRIAL.

#### A.    The Emotional Damages Awards Are Unsupported by the Evidence and Shock the Conscience.

##### (1) Legal Standard.

On appeal from a district court's denial of a motion for remittitur, this Court must "independently determine the maximum possible award that is reasonably supported by the evidence in the record." *Long v. E. Coast Waffles, Inc.*, 762 Fed. Appx. 869, 872 (11th Cir. 2019) (citations omitted).  In the absence of such record evidence, the Court has the "inherent power" to set aside the judgment. *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304, 1319 (11th Cir. 1990); *Jackson v. Magnolia Brokerage Co.*, 742 F.2d 1305, 1306–07 (11th Cir. 1984).  Likewise, where an award "is so large as to shock the conscience." *Sykes v. McDowell*, 786 F.2d 1098, 1105 (11th Cir. 1986) (citations omitted).

A judgment that shocks the conscience is one that is out of proportion to the injuries sustained by the plaintiff. *See, e.g., Woods v. Burlington N. R. Co.*, 768 F.2d 1287, 1292 (11th Cir. 1985), *rev'd for other reasons*, 480 U.S. 1 (1987).  *And see Wright v. Sheppard*, 919 F.2d 665, 669 (11th Cir. 1990) (stating that "the focus of any award of damages under § 1983 is to compensate for the actual injuries caused by the particular constitutional deprivation," and the amount "should be grounded in a determination of the plaintiff's actual losses") (citations omitted).

In this case, the sheer size of the jury's verdict, in comparison to the evidence of emotional harm, is shocking.  And this Court should focus its "inherent power" on determining whether the verdict should be vacated, in its entirety.  *Simon*, 895 F.2d at 1319; *Sykes*, 786 F.2d at 1105.

### (2)  The $15.9 Million Noneconomic Damages Award is <u>Multiples</u> of Comparable Emotional and Reputational Harm Damage Awards.

Deference to the factfinder, *see Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999), cannot be afforded here due to the unresolved possibility of jury tampering.  Indeed, as will be shown below, the size of the award here is so excessive and so disproportionate to the emotional harms claimed, that the possibility of jury tampering cannot be ignored.

But to the point, Plaintiffs' counsel, rather than focusing on any "***actual injuries*** caused ***by the particular constitutional deprivation***," so that the "amount of damages to be awarded should be grounded in a determination of the plaintiff's actual losses," *Wright*, 919 F.2d at 669, instead invited the jury to base its award not on the specific emotional injuries, but other "civil rights cases like this" — suggesting that judgments in similar civil rights cases for "harassment and also defamation from a public official" were in a "range of ten million to 20 million dollars."  DE:568:81–82, 88.

This invitation to consider purported facts not in evidence (*i.e.*, "cases like this") was "clearly objectionable" and reason alone to reverse the final judgment. *See*, *e.g.*, *Nichols v. Fannin*, 1:16-CV-4700-JSA, 2018 WL 2220872, at *16 (N.D. Ga. Apr. 16, 2018) (ruling that counsel's statement, "I've got friends who try cases like this and they're $10 million cases" in closing argument was clearly objectionable).

It was also a misrepresentation. A survey of "similar" civil rights cases reveals that the damages awarded are in a different stratosphere, and cannot be supported by the thin evidence of emotional distress here.

- *Wilson v. Taylor*, 733 F.2d 1539, 1549 (11th Cir. 1984) (holding "mere fact that [plaintiff] was angry or frustrated from the procedural violations, alone, is insufficient basis for a jury award of $**100,000**" where police officer was fired in retaliation).

- *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 899 (11th Cir. 2011) ($**300,000** award of compensatory damages affirmed for 42 U.S.C. § 1981 claim of discriminatory refusal to promote).

And this Court's precedent is in line with that of other circuits for "cases like this":

- *Paeth v. Worth Tp.*, 483 Fed. Appx. 956, 967 (6th Cir. 2012) (award of **$210,000** for retaliatory stop-work order on plaintiff's property over a permitting issue was "high" but ultimately affirmed).

56

- *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (**$300,000** award to customs officer for section 1983 employment discrimination claim **reversed** to half that amount).

- *Dossett v. First State Bank*, 399 F.3d 940, 946 (8th Cir. 2005) (noneconomic award of **$1.5 million** for retaliatory firing from bank for public comments at a public school board meeting **reversed** as "an unprecedented amount of damages in a First Amendment retaliation case").

At bottom, Plaintiffs' evidence of reputational and emotional damages was, at best, in line with the evidence discussed in the cases above, and certainly not supportive of an award 20+ times the upper limit of the range typically awarded in "civil rights cases like this" ($8.6 million to Fuller and $7.3 million to Pinilla). DE:470.

Fuller rested his reputational harm claim on the purportedly defamatory statements made by Carollo while on a radio program (though Carollo never named Fuller). DE:561:194-195. Indeed, Fuller was unable to provide details of how his reputation became "toxic" because of Carollo's actions, instead testifying that he lost his transactional attorneys (because of conflict), one lender would "no longer do business with" him because the "liability [was] too great," and a museum he sought to open was "shelved" because he was "toxic." DE:561:198-201. And for emotional damages, Fuller presented conclusory testimony that Carollo "impacted" his

"personal relationships," "family life," and his ability to "function [at his] highest and best Bill." DE:561:202. He also testified (without details) to "sleepless night[s]" and "paranoia" when entering the City. DE:561:203-204.

Pinilla testified that he had issues with lenders and banks. DE:559:157-159. He stated that he felt a "heightened level of stress" that gave him a "short fuse" with people and a short attention span with his family. DE:559:166–67.

This testimony was rudimentary in terms of first-amendment retaliation cases, and certainly not supportive of $8.6 million to Fuller and $7.3 million to Pinilla in compensatory damages. *Compare with Wilson*, 733 F.2d at 1549; *Ash*, 664 F.3d at 899; *Paeth*, 483 Fed. Appx. at 967.

The jury's award, when viewed through the prism of the evidence of damages at trial or through a comparison with other section 1983 claims, shocks the conscience by its relative magnitude. The damages must be altogether vacated, and a new trial must be ordered.

### B.   Punitive Damages Violated Due Process.

The jury's punitive damages award ($25.7 million to Fuller and $21.9 million to Pinilla) was a 3:1 ratio to the compensatory damages award. *See* DE:470. But "[w]hen compensatory damages are substantial, … a lesser ratio, perhaps only ***equal to compensatory damages***, can reach the outermost limit of the due process guarantee." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008) (emphasis

58

added) (*citing State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).

This Court in *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999), like the Supreme Court in *Campbell*, 538 U.S. at 416, has recognized procedural and substantive constitutional limitations on punitive damage awards. Those limitations impose on this Court a "mandatory duty" to safeguard against excessive punitive damages awards through a "*de novo* review" of the constitutionality of any such award. *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th Cir. 2007). *See also Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735, 750 (11th Cir. 2020) (summarizing the "guideposts" for determining constitutionality of a punitive damages award).

The jury's award of nearly $50 million in punitive damages is unconstitutionally excessive, given the circumstances and the individual defendant. For many of the same reasons that render the award of compensatory damages infirm — the lack of proportionality to the harm and customary awards — the award of punitive damages is, on its face, violative of the due process guarantees in the Constitution. It's not even in the ballpark. *See, e.g., Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 397 (D. Conn. 2017) (award of $1.5 million in punitive damages in a First Amendment retaliation case reduced to $500,000); *Grassilli v.*

*Barr*, 48 Cal. Rptr. 3d 715 (Ct. App. 2006) (punitive damages awards in section 1983 action of $3 million and $1 million reduced to $35,000 and $20,000).

The punitive damages award was also the product of the district court's failure to instruct the jury on Carollo's financial wherewithal. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981) ("evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded."); *Woods v. Reeve*, No. 21-14001, 2022 U.S. Dist. LEXIS 72666, 2022 WL 1166318 (S.D. Fla. Apr. 20, 2022) (applying the principle in a claim brought under 42 U.S.C. § 1983); *Hare v. Zitek*, 2006 WL 4069052 (N.D. Ill. Dec. 28, 2006) (in § 1983 First Amendment retaliation claim, the jury awarded a former officer $2 million in punitive damages which was reduced to $90,000, one year of the defendant's salary).

Plaintiffs' Exhibit 303 (the City Charter) established that Carollo's yearly salary was $58,200. *See* DE:506-4:12. When defense counsel referenced Carollo's salary in closing, however, the district court erroneously struck the statement and instructed the jury to ignore Carollo's salary. DE:568:143–144, 153. Despite pointing out that Carollo's salary was part of the record, the district court failed to revise its instruction or give a curative. DE:569:2, 11–16. This error left the jury without grounding for its punitive damages award, prompting its important, but

unanswered, question: "What information do we consider or use to determine Joe Carollo's Financial's [sic] resources, as it pertains to punitive damages?" DE:469:3.

The punitive damages award should be vacated as unconstitutional and a new trial should be ordered, along with the compensatory damages award.

**CONCLUSION**

Carollo requests reversal and remand for entry of judgment in his favor. Alternatively, a new trial is warranted based on the unrebutted evidence of case-impacting jury tampering. But at the very least, remand for remittitur is required.

Respectfully submitted,

Elliot B. Kula
Florida Bar No. 3794
W. Aaron Daniel
Florida Bar No. 99739
William D. Mueller
Florida Bar No. 120124
KULA & ASSOCIATES, P.A.
11900 Biscayne Boulevard, Suite 310
Miami, Florida 33181
Telephone: (305) 354-3858
eservice@kulalegal.com
elliot@kulalegal.com
aaron@kulalegal.com
william@kulalegal.com

By:   /s/ Elliot B. Kula
        Elliot B. Kula

By:   /s/ W. Aaron Daniel
        W. Aaron Daniel

By:   /s/ William D. Mueller
        William D. Mueller

*Co- Counsel for Plaintiff-Appellant*

62

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses Times New Roman 14-point typeface and contains <u>12,729</u> [out of 13,000] words.

_/s/ Elliot B. Kula_
Elliot B. Kula

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 1, 2024, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.  I also hereby certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_/s/ Elliot B. Kula_
Elliot B. Kula
