## 23-12167

# United States Court of Appeals
### *for the*
# Eleventh Circuit

WILLIAM O. FULLER, and MARTIN A. PINILLA, II,

*Plaintiffs/Appellees,*

– v. –

JOE CAROLLO,

*Defendant/Appellant,*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA IN NO. 1:18-cv-24190-RS

# BRIEF OF APPELLEES

Jeffrey W. Gutchess
Rossana Arteaga-Gomez
Samuel J. Etkin Kramer
Joanna Niworowski
Joshua A. Shore
AXS LAW GROUP PLLC
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127
(305) 297-1878
jeff@axslawgroup.com
rossana@axslawgroup.com
sam@axslawgroup.com
joanna@axslawgroup.com
josh@axslawgroup.com

*Counsel for Plaintiffs/Appellees*
*William O. Fuller and Martin Pinilla, II*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 810629)

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellees William O. Fuller and Martin Pinilla, II, respectfully include only the following persons omitted from the Certificate of Interested Persons contained in Appellant's principal brief as having an interest in the outcome of this case:

1.  Kramer, Samuel J. Etkin, Esq. *Counsel for Plaintiffs/Appellees*

2.  Moreno, Hon. Federico A., United States District Judge

/s/ Jeffrey W. Gutchess
Jeffrey W. Gutchess

## STATEMENT REGARDING ORAL ARGUMENT

Although Plaintiffs/Appellees always welcome any opportunity to answer this Court's questions, they are respectfully unable to agree with the underpinnings of Defendant/Appellant's "Statement Regarding Oral Argument," nor can they genuinely represent that an oral argument is likely to be an effective use of this Court's valuable judicial resources.

Specifically, although Plaintiffs' complaint "implicat[es] constitutional principles," the issues raised in Appellants' principal brief are standard fare. Dkt.26:7. Nor did the district court mindlessly "reject … unrebutted evidence of" "jury tampering … without full process," as Appellant's Statement suggests. Rather, the district court accepted the relevant allegations concerning a juror's extrinsic contact with a nonparty, conducted an *in camera* investigation including a separate inquiry of each juror with the parties' present in a closed courtroom, adopted most of Appellant's proposed curative measures, and concluded that there was no reasonable possibility of prejudice warranting a mistrial. *Id*.

Finally, in that same connection, Appellant already had a chance to "assist the Court in navigating the course of proceedings" and "allow a fulsome discussion of the issues." *Id*. But Appellant chose not to comply with his obligation under this Court's Rules to provide a Statement of the Case that stated "the facts accurately, those favorable and … unfavorable to [him]." 11th Cir. R. 28-1(i). Instead, Appellant

i

challenged the adequacy of the evidence and administration of trial based only on facts favorable to him, while omitting any facts unfavorable to him, obscuring the course of proceedings and frustrating a fulsome discussion of the issues. It is unlikely that an oral argument will ameliorate these diversions stemming from Appellant's deficient Statement of the Facts.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...............................................C1 of 1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS......................................................................... iii

TABLE OF AUTHORITIES .....................................................................v

STATEMENT REGARDING JURISDICTION ...................................................1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE...................................................................3

STANDARDS OF REVIEW ...................................................................13

SUMMARY OF THE ARGUMENT ..................................................................15

ARGUMENT ...................................................................................16

    A.    The Trial Court Correctly Denied Carollo's Motion for Judgment
        as a Matter of Law......................................................................17

        1.    The Trial Record Supports a Jury Finding that Plaintiffs
            Engaged in Protected Speech...................................................18

        2.    The Trial Record Supports a Jury Finding that Carollo
            Retaliated "Under Color of Law" .............................................22

        3.    The Trial Record Supports a Jury Finding of Causation .........27

    B.    The Trial Court Did Not Abuse Its "Large Discretion" in
        Denying Carollo's Motion for Mistrial .............................................36

        1.    The District Court Did Not Abuse Its "Large Discretion"
            to Investigate and Address a Juror's Fleeting Extrinsic
            Contact with a Nonparty .........................................................37

        2.    The District Court Did Not Abuse Its "Large Discretion"
            to Reject Carollo's Efforts to Induce a Tactical Mistrial
            and to Find No Reasonable Possibility of Prejudice ...............42

    C.    The Trial Court Did Not Abuse Its "Considerable Discretion" in
        Denying Carollo's Motion for New Trial or Remittitur ....................48

CONCLUSION ........................................................................................56

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Action Marine, Inc. v. Cont'l Carbon Inc.*,
  481 F.3d 1302 (CA11 2007)...........................................................................54

*Alzamora v. Sec'y Dept. of Corr.*,
  463 F. App'x 816 (CA11 2012)......................................................................36

*Artis v. Santos*,
  95 F.4th 518 (CA7 2024)................................................................................28

*Ash v. Tyson Foods, Inc.*,
  664 F.3d 884 (CA11 2011).............................................................................50

*Bailey v. Swindell*,
  89 F.4th 1324 (CA11 2024)............................................................................13

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.*,
  955 F.2d 1467 (CA11 1992)...............................................................14, 37, 44

*Bello-Reyes v. Gaynor*,
  985 F.3d 696 (CA9 2021).........................................................................29, 31

*Bennett v. Hendrix*,
  423 F.3d 1247 (CA11 2005)...........................................................................23

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996).......................................................................................54

*Bogle v. McClure*,
  332 F.3d 1347 (CA11 2003)...............................................................14, 48, 54

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*,
  492 U.S. 257 (1989).......................................................................................14

*Cantu v. Flanigan*,
  705 F. Supp. 2d 220 (E.D.N.Y. 2010)............................................................49

*CarePartners, LLC v. Lashway*,
  545 F.3d 867 (CA9 2008).........................................................................29, 32

*Carroll v. Trump,*
  2024 WL 1786366 (S.D.N.Y. Apr. 25, 2024) ................................................49

*Colonies Partners LP v. County of San Bernadino,*
  2020 WL 5102160 (C.D.Cal. July 28, 2020) ................................................19

*Cross v. Equityexperts.org,*
  2021 WL 5279412 (CA11 Nov. 12, 2021) ....................................................14

*Cuevas v. City of Sweetwater,*
  No. 15-22785-CIV, ECF No. 38 (S.D.Fla. Oct. 28, 2015)...........................24

*Davis v. White,*
  2022 WL 3083458 (N.D.Ala. Aug. 3, 2022) ................................................52

*DeMartini v. Town of Gulf Stream,*
  942 F.3d 1277 (CA11 2019)......................................................30, 32, 33, 34

*Dossett v First State Bank,*
  399 F.3d 940 (CA8 2005)..............................................................................50

*Espanola Way Corp. v. Meyerson,*
  690 F.2d 827 (CA11 1982)............................................................................25

*Estate of Cummings v. Davenport,*
  906 F.3d 934 (CA11 2018)............................................................................26

*Ferrill v. Parker Group, Inc.,*
  168 F.3d 468 (CA11 1999)............................................................................49

*Frederickson v. Landeros,*
  943 F.3d 1054 (CA7 2019)............................................................................28

*Freeman v. Guiliani,*
  No. 21-CV-03354, DE 159 (D.D.C. Apr. 15, 2024) ....................................49

*Fuller v. Carollo,*
  2022 WL 333234 (CA11 Feb. 4, 2022)...............................................1, 3, 24

*Fuller v. Carollo,*
  No. 19-12439, 977 F.3d 1012 (CA11 2020) ..................................................1

*Gaithright v. Portland*,
    439 F.3d 573 (CA9 2006)..............................................................21

*Gazarkiewicz v. Town of Kingsford Heights, Ind.*,
    359 F.3d 933 (CA7 2004)..............................................................19

*Gonzalez v. Trevino*,
    144 S.Ct. 1663 (2024)...................................................................33

*Greisen v. Hanken*,
    252 F. Supp. 3d 1042 (D.Or. 2017), *aff'd*,
    925 F.3d 1097 (CA9 2019)......................................................50, 51

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (CA9 2008)............................................................50

*Hartman v. Moore*,
    547 U.S. 250 (2006).......................................................................31

*Highland Consulting Grp., Inc. v. Minjares*,
    74 F.4th 1352 (CA11 2023)..........................................................13

*Hillside Prods., Inc. v. Duchane*,
    249 F. Supp. 2d 880 (E.D.Mich. 2003) .......................................25

*Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*,
    430 F. Supp. 2d 1296 (S.D.Fla. 2006)....................................24, 28

*Jackson v. State of Ala. State Tenure Comm'n*,
    405 F.3d 1276 (CA11 2005)..........................................................23

*Johansen v. Combustion Eng'g, Inc.*,
    170 F.3d 1320 (CA11 1999)...................................................53, 54

*Johnston v. Borders*,
    36 F.4th 1254 (CA11 2022)..........................................................22

*Kemp v. Am. Tel. & Tel. Co.*,
    393 F.3d 1354 (CA11 2004)..........................................................53

*Kim v. Nash Finch Co.*,
    123 F.3d 1046 (CA8 1997)............................................................51

*Lenz v. Winburn*,
    51 F.3d 1540 (CA11 1995)................................................................25

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018).................................................29, 30, 31, 51

*Marsh v. Ill. Cent. R. Co.*,
    175 F.2d 498 (CA5 1949)..............................................................17

*Miko v. Jones*,
    2023 WL 196920 (N.D.Ga. Jan. 17, 2023) ....................................51

*Moore v. Appliance Direct, Inc.*,
    708 F.3d 1233 (CA11 2013)..........................................................14

*Munoz v. Oceanside Resorts, Inc.*,
    223 F.3d 1340 (CA11 2000)....................................................48-49

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    144 S.Ct. 1316 (2024)...................................................................29

*Neder v. United States*,
    527 U.S. 1 (1999).........................................................................36

*Nichols v. Fannin*,
    2018 WL 2220872 (N.D.Ga. Apr. 16, 2018)................................50

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)....................................................................30

*Oladeinde v. City of Birmingham*,
    230 F.3d 1275 (CA11 2000)..........................................................23

*Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*,
    996 F.3d 1342 (Fed. Cir. 2021) ....................................................17

*Pac. Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991)........................................................................54

*Paeth v. Worth Tp.*,
    483 F. App'x 956 (CA6 2012).......................................................50

*Port Terminal & Warehousing Co. v. John S. James Co.*,
    695 F.2d 1328 (CA11 1983) ........................................................... 47

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
    222 A.D.2d 1020 (N.Y.App.Div. 1995) ...................................... 49

*S.E. Prop. Holdings, LLC v. Judkins*,
    882 F. App'x 929 (CA11 2020) ..................................................... 52

*Salinas v. O'Neill*,
    286 F.3d 827 (CA5 2002) ............................................................... 50

*Samia v. United States*,
    599 U.S. 635 (2023) ......................................................................... 46

*Schopler v. Bliss*,
    903 F.2d 1373 (CA11 1990) .................................................... 25, 28

*Smith v. Phillips*,
    455 U.S. 209 (1982) ......................................................................... 43

*Smith v. Wade*,
    461 U.S. 30 (1983) ........................................................................... 52

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................... 52, 53

*Sweet Sage Cafe, LLC v. Town of N. Redington Beach, Fla.*,
    380 F. Supp. 3d 1209 (M.D.Fla. 2019) ................................... 24, 33

*Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*,
    815 F.2d 1435 (CA11 1987) ........................................................... 17

*Tooltrend, Inc. v. CMT Utensili, SRL*,
    198 F.3d 80 (CA11 1999) ............................................................... 17

*Tuggle v. Hill*,
    2009 WL 10688077 (N.D.Ga. May 4, 2009) ............................... 51

*Tunsill v. Comm'r of Educ.*,
    854 F. App'x 360 (CA11 2021) ..................................................... 13

*Turner v. Williams*,
 65 F.4th 564 (CA11 2023)...................................................................31

*TXO Prod. Corp. v. All. Res. Corp.*,
 509 U.S. 443 (1993)........................................................................54

*United States v. Baptiste*,
 596 F.3d 234 (CA4 2010).................................................................43

*United States v. Benjamin*,
 958 F.3d 1124 (CA11 2020).............................................................45

*United States v. Caldwell*,
 776 F.2d 989 (CA11 1985)...........................................................14, 37

*United States v. Olano*,
 507 U.S. 725 (1993)........................................................................43

*United States v. Pagan-Romero*,
 894 F.3d 441 (CA1 2018).................................................................43

*United States v. Pessefall*,
 27 F.3d 511 (CA11 1994).................................................................44

*United States v. Ronda*,
 455 F.3d 1273 (CA11 2006).....................................................13, 46, 47

*United States v. Rowe*,
 906 F.2d 654 (CA11 1990).............................................................44, 45

*United States v. Siegelman*,
 640 F.3d 1159 (CA11 2011).............................................................47

*United States v. Sylvester*,
 143 F.3d 923 (CA5 1998).................................................................43

*United States v. Whatley*,
 719 F.3d 1206 (CA11 2013)...........................................................47-48

*United States v. Williams-Davis*,
 90 F.3d 490 (CADC 1996)...............................................................43

*Wallace v. Mangiaracina*,
    745 F. App'x 356 (CA11 2018)......................................................................50

*Wilson v. Taylor*,
    733 F.2d 1539 (CA11 1984)..........................................................................50

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (CA9 2003)...........................................................................53

**STATUTE**

42 U.S.C. § 1983.................................................2-3, 15-16, 21-22, 24, 27, 32-33, 53

**RULE**

11th Cir. R. 28-1(i)......................................................................................49

**OTHER AUTHORITY**

U.S. Const. amend. I ............................2-4, 6, 8, 15-16, 19, 21-24, 28-29, 32-33, 48

## STATEMENT REGARDING JURISDICTION

Plaintiffs/Appellees adopt Defendant/Appellant's "Statement of Jurisdiction," and add that the proceedings below generated two related interlocutory appeals, resulting in two final rulings of this Court, one of which was entered following oral argument:

> *Fuller v. Carollo*, No. 19-12439, 977 F.3d 1012 (CA11 2020), Oral Arg. Sept. 22, 2020

> *Fuller v. Carollo*, No. 21-11746, 2022 WL 333234 (CA11 Feb. 4, 2022), cert. denied, 143 S.Ct. 203 (2022)

## STATEMENT OF THE ISSUES

The following list states the legal issues that are presented for this Court's review in a manner that is not argumentative, incomplete, and misleading:

1.    Whether the district court properly denied Carollo's motion for judgment as a matter of law because the trial record supports the unanimous jury's findings as to all elements of Plaintiffs' claim for First Amendment retaliation in violation of 42 U.S.C. § 1983?

2.    Whether the district court properly exercised its wide discretion to deny Carollo's motion for a mistrial after conducting an *in camera* investigation concerning a fleeting interaction between a juror and a nonparty; applying curative measures; making trial rulings to limit the presentation of cumulative evidence; and ultimately finding that there was no reasonable possibility of prejudice for or against any party despite Carollo's attempts to induce a tactical mistrial?

3.    Whether the district court properly exercised its wide discretion to deny Carollo's motion for remittitur or for a new trial based on the unanimous jury's assessment of compensatory and punitive damages based on a relentless First Amendment retaliation campaign spanning several years, including after the verdict, resulting in severe emotional distress and reputational harm, as well other considerations reflecting a need for punishment and deterrence?

2

## STATEMENT OF THE CASE

A challenge for this Court lies in the fact that the jury's verdict and the district court's rulings are supported by a mountain of evidence and testimony that is both consistent and credible, but depicts a First Amendment retaliation campaign that is almost too outrageous to grasp through a cold record or dispassionate appellate brief. The trial court did not err, but the extraordinary facts of this case are more than sufficient to explain the basis for the jury's discretionary award of damages and render any purported error to be harmless.

In an earlier interlocutory appeal, this Court summarized the nature of this case: Plaintiffs William O. Fuller and Martin Pinilla, II are "businessmen from the Little Havana neighborhood of Miami," who sued Defendant Joe Carollo under 42 U.S.C. § 1983 for "us[ing] his official authority" as a City of Miami Commissioner to "repeatedly harass[ ] them in retaliation for their political support of his election opponent in violation of the First Amendment." *Fuller v. Carollo*, 2022 WL 333234, at *1 (CA11 Feb. 4, 2022).

This Court's summary of the allegations in the complaint, however, do not fully capture the ruthless intensity of Carollo's campaign to terrorize Plaintiffs in nearly every facet of their lives; the severity of the emotional and reputational harm that Plaintiffs experienced; or the remorseless efficiency with which Carollo chilled

the free speech of his political opponents and eroded City Hall, calling for stern punishment and deterrence. As the district court underscored, Carollo's "weaponiz[ation]" of his official authority was so pervasive and disproportionate that it "shock[s] the conscience." Trial.Dkt.631:7-8.

Due to the space constraints of this brief, Plaintiffs can only provide the most cursory overview of the trial record. But to better appreciate how the jury and the district court properly evaluated the evidence and assessed the demeanor of the witnesses to arrive at their respective verdict and judgment, Plaintiffs encourage the Members of this Court to immerse themselves in the trial transcripts. The testimony offered by several devoted, career public servants—including Carollo's own former Chief of Staff Richard Blom (4/18/23.Tr.:175-212; 4/19/23.Tr.:9-111), former City Manager Emilio Gonzalez (4/11/23.Tr.:12-149; 4/25/23.Tr.:113-39), and former Chief of Police Art Acevedo (4/18/23.Tr.:75-174)—deserves particular attention.

As a whole, the trial record supports the unanimous jury's reasonable award of damages and express findings that: (a) Plaintiffs engaged in First Amendment political expression; (b) which was the "motivating factor" for Carollo's multi-year campaign of retaliation "under color of law" that would not have occurred but for Plaintiffs' protected activities; (c) which, in turn, not only caused Plaintiffs to suffer extreme emotional distress and reputational harm, but also chilled the willingness of

similarly situated citizens to participate in political activity, and decimated the ranks of the City's most decorated public servants.

* * *

Plaintiffs have dedicated their careers to revitalizing Little Havana from a run-down, poverty-stricken neighborhood to a thriving cultural center with "more than three million visitors … every year." 4/24/23.Tr.:154-55, 182. Plaintiffs are responsible for managing projects, businesses, and properties worth millions of dollars each, with partners, tenants, and employees who—in addition to Plaintiffs' own families—depend on Plaintiffs to maintain their livelihoods. *See, e.g.*, 5/8/23.Tr.:116-17, 143-46.

Beginning in November 2017, Plaintiffs orchestrated and hosted political activities in support of Carollo's election opponent, including rallies across from the voting center with food that they purchased. *See e.g.*, 4/24/23.Tr.:50-51; 5/5/23.Tr.:187-188; 5/8/23.Tr.:55; 5/9/23.Tr.:181-183. Carollo also mistakenly believed that Plaintiff Fuller financed a lawsuit that Carollo's election opponent filed to prevent Carollo from taking office. 5/9/23.Tr.:206. Throughout Carollo's term in office, Plaintiffs continued to engage in protected political expression to oppose Carollo's political platform, including preparing and executing an ethics complaint that was filed against Carollo. 5/10/23.Tr.:45-46; Pl.Ex.425. Plaintiffs also expressed

their opposition by filing this lawsuit and appearing at City Commission hearings to criticize Carollo's ongoing First Amendment retaliation campaign:

> [Carollo is] shutting down my business which represents taxes, opportunity, employment in your district. How dare you, sir. You know you've been targeting. You know that you have been targeting my business. Everybody in the city knows you've been targeting my business.

Pl.Ex.121-A; *accord* Trial.Dkt.:99:13.

No less than 16 witnesses with direct knowledge of Carollo's political retaliation testified at trial—including the City Manager, three former Chiefs of Police (one of whom served as Carollo's Chief of Staff), the Director of Code Compliance, a former Commissioner, and lower-level operatives forced to carry out the retaliation campaign. Several of those witnesses had devoted their careers to public service and were driven out of City Hall for refusing to participate in Carollo's retaliation.

In their testimony at trial, which was consistent with contemporaneous notes, emails, and memoranda, these witnesses described Carollo's "targeting" of Plaintiffs in clear terms and cited it as a basis for their leaving public service with the City of Miami, consistent with Carollo's longstanding notorious reputation for "abusing power [and] using government resources to intimidate his political opponents." Trial.Dkt.125:¶28 (quoting media). For example, Carollo's former Chief of Staff, the

former Chief of Police of Doral, resigned because Carollo had him "focusing on this one individual" (Plaintiff Fuller) for harassment. Pl.Ex.202.

One now-former Chief of Police, Jorge Colina, concurred that Carollo was "selectively targeting [Plaintiffs'] business for new investigations." Pl.Ex.146. Colina's successor, Art Acevedo, similarly described "the wrath of Joe Carollo" that City employees would face for resisting Carollo's orders "to inspect and [go] into [Plaintiffs'] businesses on a regular basis," consistent with what was "wide open knowledge in Miami" that Plaintiffs were "being targeted" in retaliation for exercising their "Constitutional rights," which was not "speculation," but rather "well known, spoken about openly in the city government." 5/30/23.Tr.:84-86, 103.

Former City Manager, Emilio Gonzalez, a distinguished Army veteran, lawyer, and Ph.D who served as Director of the United States Citizenship and Immigration Services and a national Security and Foreign Policy Advisor to the President, testified at length about his disgust that Carollo was pressuring him "to look at [Plaintiffs'] properties … with the intention of essentially finding a way to shut them down," and to "weaponize city government against" Plaintiffs. 4/11/23.Tr.:47, 60; *accord* Pl.Ex.135 (Deputy City Manager).

All of these officials were replaced by less experienced individuals loyal to Carollo—with Carollo playing the theme music to the "Godfather" at a private ceremony for the Chief of Police who replaced Acevedo—because they could be

trusted to carry out his retaliation campaign without resistance. For instance, after being promoted from the Miami Parking Authority to replace City Manager Gonzalez, Carollo's allies convened "a lengthy meeting with almost the entire City Attorney office ... talking about [Plaintiff] Fuller," and later implored his subordinates to "Be a Goldfish" and forget the "really bad, very bad" things they were forced to do to retaliate against Plaintiffs. Pl.Ex.539 & 601; 5/30/23.Tr.:58-59.

One day after that initial meeting, on May 28, 2020, an email circulated among City staff with a subject line of "Copy of Fuller Properties" containing lists of Plaintiffs' properties, which were updated weekly throughout the summer, culminating in an email on October 2020, entitled "progress of Carollo Investigation" which was limited to Plaintiffs' properties, just one day before the City closed one of Plaintiffs' most prominent and historic venues, the Ball & Chain nightclub in Little Havana. Pl.Ex.610; *accord* Trial.Dkt.99:14-15 (summarizing allegations of retaliation that were ultimately proved at trial).

In short, because Plaintiffs had the temerity to exercise their First Amendment rights, Carollo used his government power to subject them to the constant threat of their own personal ruin, as well as disappointing the expectations of all those who rely on them. As Plaintiff Pinilla testified:

> Carollo devised a multifaceted campaign of destruction ... that included going out publicly on the radio [and] on the dais where he consistently accused us of being money launderers connected to the

communist regime … . Attacking not only us, but attacking our tenants, and basically letting the world know you do not do business with [us].

5/8/23.Tr.:117. In a word, Carollo sought to make Plaintiffs toxic to those closest to them and make it impossible for Plaintiffs to live peaceably or earn a living in their own community. *See, e.g.*, 4/18/23.Tr.:85-89; 4/19/23.Tr.:130, 134, 179; 4/23/23.Tr.:56, 61, 76-77; 4/24/23.Tr.:54-58, 73, 109, 138; 4/25/23.Tr.:16-17; 4/25/23.Tr.:10-12, 25-26; 5/1/23.Tr.:69-81, 89-94, 152-53; 5/2/23.Tr.:67-82; 5/8/23.Tr.:107-08, 112, 140-49, 153, 170, 183; 5/9/23.Tr.:39; 5/10/23.Tr.:38-39, 104-05, 149.

To that end, Carollo made it clear to Plaintiffs' banks, tenants, partners, and potential investors that, because they had picked "the wrong landlord," they would lose Carollo's "support," they would face investigation and arrest, and their "efforts to open and operate [their] business[es]" would continue to be "sabotag[ed]" until they disassociated from Plaintiffs. *Id.*

These were not empty threats: Even on religious holidays and peak business hours, Carollo directed "[d]ozens and dozens and dozens" of harrowing—and potentially dangerous—raids of these businesses and properties, often by SWAT teams armed with "badge[s], bullet proof vests, [and] guns," rattling employees and driving away customers. In testimony that was often tearful, Plaintiffs' tenants and business associates explained how it became "too risky" to associate with Plaintiffs

"because of the harassment from Carollo directly," with some business owners leaving the City of Miami altogether. *Id*.

Although Carollo had met Plaintiff Fuller only once before taking office, to solicit his support, he began defaming Plaintiffs immediately after taking office. Among other things, Carollo falsely claimed that Plaintiffs were associated with the corrupt, communist Maduro regime in Venezuela, and that they were frauds, mobsters, and criminals of the worst kind, who engaged in money laundering, prostitution, and fraud. *Id*.

The jury and the district court—but not this Court—were able to observe the demeanor and assessed the credibility of numerous witnesses who offered six weeks of heartfelt and gut-wrenching testimony conveying the gravity of Carollo's retaliation which devastated the development of Plaintiffs' businesses; their vision for the neighborhood, their reputations in the community; their physical and mental health; and their relationships with their families, including their young children. *See, e.g.*, 4/19/23.Tr.:179-181, 222; 4/24/23.Tr.:46, 61-68, 77-78; 4/25/23.Tr.:21-23; 4/25/23.Tr.:75; 5/5/23.Tr.:195-99; 5/8/23.Tr.:116-117, 153-160; 5/9/23.Tr.:75-76, 241-43; 5/10/23.Tr.:28, 48, 75, 124, 182, 191-192, 200-202.

For example, Plaintiff Fuller and his wife described his inability to enjoy any peace of mind in his hometown, being forced into heated altercations with Carollo's aides during festivals while holding his crying daughter in his arms, and

experiencing crippling paranoia and fear of false arrest that made him afraid to drive his car in Miami or go to work at his office in Little Havana. *Id*. For "five and a half years," Plaintiffs "faced constant anguish every day," from a "constant fear of destruction" and an "overwhelming sense of dread" not knowing "where the next attack is coming from," feeling the responsibility of exposing those who relied on them to constant harassment on their account, and disappointing those closest to them. *Id*. Stress, anxiety, emotional distress, and personal humiliation manifested in the form of deteriorating physical health, lack of sleep, and damaged familial relationships, with Plaintiff Fuller's wife describing him as a different man. *Id*.

In the wake of the jury's verdict, Carollo showed no remorse. Not only did he demean the jury and the district court in the media, but he also intensified his retaliation campaign against Plaintiffs, including falsely accusing them of committing even more infamous crimes. *See generally* Trial.Dkt.512:6, 13-16; Trial.Dkt.539:1-2; Trial.Dkt.597:1. Calling all of this a case of "crocodile tears" in a principal brief to this Court, Dkt.26:44, is an unwarranted affront to the jury and the district court, who properly recognized that the direct and indirect harm that Carollo inflicted by retaliating against Plaintiffs for engaging in free speech; by chilling opposing political discourse; by abusing his government authority; and by thinning the professional ranks of City Hall, all of which is worthy of compensation, punishment, and deterrence.

11

At least some of Carollo's arguments are raised for the first time in this appeal, but every argument that he did not forfeit is meritless for the reasons stated in Plaintiffs' briefs and arguments below and squarely rejected by the district court in well-reasoned and thorough orders that are not subject to reversal for any reason. *See generally* Trial.Dkt.534, 538, 539 (briefs); Trial.Dkt.:324, 623, 631 (orders).

## STANDARDS OF REVIEW

1.    This Court reviews "de novo the denial of a motion for judgment as a matter of law" by "review[ing] the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," and reversing "only if the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." *Highland Consulting Grp., Inc. v. Minjares*, 74 F.4th 1352, 1358 n.2 (CA11 2023); *accord Bailey v. Swindell*, 89 F.4th 1324, 1329 (CA11 2024) ("We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence," giving "deference to the jury's discernible resolution of disputed factual issues") (internal quotation marks omitted).

When the district court's judgment "is based on multiple, independent grounds, an appellant must convince" this Court that "every stated ground for the judgment against [him] is incorrect." *Tunsill v. Comm'r of Educ.*, 854 F. App'x 360, 360 (CA11 2021). And, when "a party fails to challenge any one of those independent grounds on appeal, [he] has abandoned any challenge on that ground, and 'it follows that the judgment is due to be affirmed.'" *Id.*

2.    This Court reviews "the denial of a motion for a new trial" or "for mistrial" based on "the jury's exposure to extrinsic evidence for abuse of discretion." *United States v. Ronda*, 455 F.3d 1273, 1296 n.33 (CA11 2006).

13

First, "the investigative procedure to be used in checking for juror misconduct falls within the discretion of the district court." *United States v. Caldwell*, 776 F.2d 989, 997 (CA11 1985). Second, the "factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's 'large discretion.'" *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1472 (CA11 1992).

3.      "This Court reviews the denial of a motion for remittitur or new trial under an abuse of discretion standard." *Moore v. Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (CA11 2013).

First, this Court reviews "the district court's decision to sustain compensatory damages for clear abuse of discretion," which are "accorded 'a presumption of validity,'" and cases involving "damages for intangible, emotional harm" are particularly "'deferential to the factfinder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.'" *Bogle v. McClure*, 332 F.3d 1347, 1359 (CA11 2003). Second, in "reviewing an award of punitive damages," this Court should "accord considerable deference to a district court's decision not to order a new trial." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 280 (1989); *accord Cross v. Equityexperts.org*, 2021 WL 5279412, at *7 (CA11 Nov. 12, 2021) ("The district court's determination of the amount of emotional distress and punitive damages was neither clearly erroneous nor an abuse of discretion").

14

## SUMMARY OF THE ARGUMENT

A.    The district court did not err in denying Carollo's motion for judgment as a matter of law because "some evidence"—indeed *overwhelming* evidence—supports every element of Plaintiffs' claim for First Amendment retaliation in violation of 42 U.S.C. § 1983. Based on the trial record a rational juror could find—and this unanimous jury did find—that: (1) Plaintiffs engaged in protected political expression; (2) which caused Carollo to retaliate against Plaintiffs "under color of law"; (3) which, in turn, caused Plaintiffs' injury.

B.    The district court did not abuse its wide discretion in denying Carollo's motions for mistrial based on a report of a juror's fleeting extrinsic contact with a nonparty after conducting a thorough *in camera* inquiry that Carollo commended; adopting virtually all of the ameliorative measures that Carollo proposed; concluding that Carollo was attempting to instigate a tactical mistrial; and finding that there was no reasonable probability of juror prejudice.

C.    The district court did not abuse its wide discretion in denying Carollo's motion for new trial or remittitur based on the jury's award of damages, which was entitled to considerable deference and, in all events, was both reasonable and constitutional.

15

# ARGUMENT

To punish Plaintiffs for their political expression, Joe Carollo, a City of Miami Commissioner, hijacked the machinery of government to destroy Plaintiffs' businesses, reputations, and ability to provide for their families. Carollo not only abused his own official power, but also gave unlawful directives beyond the scope of his lawful authority. Consequently, Carollo irreparably damaged Plaintiffs' lives while chilling others from engaging in similar political opposition and purging City Hall of some of its most experienced and decorated public servants who objected to his blatantly unconstitutional misconduct.

Following a six-week trial, the jury (in its unanimous verdict) and the district court (in its post-trial orders) correctly determined that: (a) Plaintiffs satisfied all the legal elements of a claim for First Amendment retaliation in violation of 42 U.S.C. § 1983; (b) a juror did not have prejudicial extrinsic contact with a nonparty; and (c) the jury's award of compensatory and punitive damages was reasonable and constitutional. Carollo abused his official "position and power to weaponize the City government" to punish the free speech of his constituents in a manner that was so "continuous[,] unrelenting, … intentional and malicious" that it "shock[s] the conscience." Trial.Dkt.631:7-8.

## A.    The Trial Court Correctly Denied Carollo's Motion for Judgment as a Matter of Law

Carollo urges this Court to overturn the jury's unanimous resolution of factual disputes by ignoring all adverse evidence in the record and construing all inferences in the light most favorable to himself. *But see, supra*, at 12 (standard of review). Carollo's demand for a judgment as a matter of law, however, "raises a question of law only: Whether there is any evidence which, if believed, would authorize a verdict against" him. *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (CA11 1999) (quoting *Marsh v. Ill. Cent. R. Co.*, 175 F.2d 498, 500 (CA5 1949)). In conducting that analysis, the jury is presumed to have "made all verdict-supporting factual findings that are supported by substantial evidence." *Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, 996 F.3d 1342, 1350 (Fed. Cir. 2021) (citing cases).[1]

---

[1] In a section of his brief titled "CAROLLO WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW," which addresses the sufficiency of the evidence and seeks the entry of judgment in his favor, Carollo inserted a one-sentence footnote seemingly challenging the adequacy of the jury instructions and seeking a new trial. *See* DE 26:67. To the extent that Carollo's demand for a new trial is based on a different standard of review and seeks a different remedy than his demand for a judgment in his favor, he did not adequately develop such an argument by raising it in a passing footnote remark. *See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (CA11 1987) ("[A] single footnote in [an] initial brief did not sufficiently preserve the … issue.").

17

1.    _The Trial Record Supports a Jury Finding that Plaintiffs Engaged in_
      _Protected Speech_

Carollo misrepresents that "the evidence at trial was undisputed" that Plaintiffs neither "broadcast any … speech" of their own nor "adopted the speech" that Carollo claims was disseminated through their closely held LLCs. Dkt.26:60-64. The trial record supports the jury's finding that Plaintiffs engaged in both types (or either type) of protected political expression.

Carollo is hard-pressed to argue that the jury could not attribute any political speech to Plaintiffs given that his own contemporaneous communications represent some of the most striking evidence on that score. For instance, when Carollo learned of the rally for his election opponent being held on Plaintiffs' property—which Plaintiff Pinilla was attending—he did not call any LLC, but rather contacted Plaintiff Fuller directly. 4/20/23.Tr.:79-80; 5/8/23.Tr.:62; 5/9/23.Tr.:188-89. Then, on Election Day, Carollo pointedly asked Fuller why he was not wearing his "'blue and yellow' shirt"—colors signifying support of Carollo's election opponent. Pl.Ex.553. And, when Plaintiff Fuller conveyed his "congratulations" through one of Carollo's aides and expressed his hope that they could "work together," Carollo responded, "f-uck you, f-uck him," and stated that he considered Fuller "an enemy" based on support of Carollo's election opponent. 4/20/23.Tr.:78-79; _accord_ 4/19/23.Tr.:106 (Carollo's Chief of Staff testifying about Carollo's "personal

animus" towards Plaintiff Fuller based on his First Amendment activities). Carollo believed (albeit mistakenly) that Plaintiffs were financing a lawsuit challenging his candidacy, and there is no indication that Carollo even knew the names of Plaintiffs' LLCs when he began his retaliation. 5/9/23.Tr.:206.

To put it simply, Plaintiffs "played a significant role" in disseminating a slew of expressive messages in opposition to Carollo, who retaliated against them "on that basis," making this case "a far cry from a case in which" Plaintiffs "disclaim[ ] any involvement in the speech" of a separate entity. *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 938 n.1 (CA7 2004). ("reject[ing] the defendants' contention that [plaintiff's] involvement with the flyer" published by a third party was not "eligible for First Amendment protection"; rather, defendants' retaliation was "triggered by [plaintiff's] involvement with the flyer" regardless of who actually published it); *accord Colonies Partners LP v. County of San Bernadino*, 2020 WL 5102160, at *27 (C.D.Cal. July 28, 2020) (cited in Dkt.26:63-64; Dkt.:27-4:8) ("The Court finds there is a triable issue" pertaining to "the tendency … to conflate [the entity] and [the individual], and the possibility that Defendants retaliated against both Plaintiffs simultaneously").

Contrary to Carollo's after-the-fact contention that Plaintiffs only expressed their speech through their LLCs, the First Amendment does not compel a pick-and-choose approach where protected activities can only be attributed to an individual or

19

his entity, but not both. To the contrary, even Carollo seemingly acknowledges the general principle that individuals (e.g., Plaintiffs) may "adopt[ ] the speech" of others (e.g., their LLCs). Dkt.26:61. And the trial record as a whole—particularly when viewed in the light most favorable to Plaintiffs—reflects Plaintiffs' role in a wide range of expressive activities, including organizing and attending political rallies; preparing and distributing campaign flyers; and generating and filing an ethics complaint:

> [Carollo's counsel].   Let's talk about the second element of the speech which is the campaign rallies for Alfie Leon. Do you recall testifying here today that your testimony was that you individually supported Alfie Leon, correct?
>
> [Pinilla].   Both Bill [Fuller] and I supported him.
>
> [Carollo's counsel].   Now, to be clear—I'm sorry—
>
> [Pinilla].   Individually, yes.
>
> * * *
>
> [Carollo's counsel].   The campaign contributions that you made to the Alfie Leon campaign were made by limited liability companies, correct? Not you individual?
>
> [Pinilla].   No, that's not correct. In the runoff, I made many expenditures with my own credit card … .

5/8/23.Tr.:215-16; *accord id.*:47-48 (Plaintiffs undertaking "a more creative approach" than merely "writ[ing] a check" to support Carollo's election opponent, by helping to "create a whole campaign" that "included creating videos, creating flyers, doing social media campaigns on Facebook on Next Door, creating rallies,

[and] hiring actors to dress up as lions because Alfie Leon's last name means lion. …"); *supra*, at 5-6 (citing trial record).[2]

Accordingly, even under the cases Carollo cites, there is at least some evidence—if not overwhelming evidence—to support a jury finding that Plaintiffs engaged in protected speech in several different ways, including by speaking for themselves, by using their LLCs to further their political expression, by directing political expression that included their LLCs, by adopting the political expression of their LLCs, or any combination of those things. *Gaithright v. Portland*, 439 F.3d 573, 577-78 (CA9 2006) (cited in Dkt.26:61) ("[T]he Supreme Court made clear that" the participants in a parade could comprise an "expressive message attributable to the parade's organizer"). Or, as the district court put it, the trial record as a whole contained "sufficient evidence to support the jury finding" that: (a) Plaintiffs independently "engaged in protected actions"; (b) Plaintiffs were "the driving force behind their business entities' exercise of their First Amendment rights"; and/or

---

[2] Carollo inexplicably omits one of the four forms of protected activity that supported the jury's verdict—namely, the filing of "an ethics complaint against Carollo." *Compare* Dkt.26:44 (Carollo identifying three forms of protected activity reflected in the jury instructions), *with* Dkt.27-4:31 (jury instructions identifying four forms of protected activity). Similar to all the other forms of protected activity, the trial record also supports a jury finding that Plaintiffs adopted the ethics complaint as their own speech. *See, e.g.*, 5/8/23.Tr.:84 ("Q. And so who filed this complaint with the Commission on Ethics?  A. Bill and Martin did.  Q. And you're Martin?  A. I'm Martin Pinilla, yes.").

(c) Carollo "perceived Plaintiffs as engaging in free speech and dealt with Plaintiffs on that basis." Dkt.27-9:174; *accord* Trial.Dkt.538.

2.    <u>*The Trial Record Supports a Jury Finding that Carollo Retaliated "Under Color of Law"*</u>

In the district court, Carollo did not challenge the sufficiency of the evidence to support the jury's express finding that he retaliated against Plaintiffs "under color of law." *See* Dkt.26:38 (Carollo summarizing the arguments raised in his post-trial motion) (Trial.Dkt.498)). Indeed, until this appeal, Carollo had staked out the opposite position, insisting that, "[a]t all times, [he] was act[ing] within his authority as a Commissioner." Dkt.27-3:235. This argument is waived. *See Johnston v. Borders*, 36 F.4th 1254, 1276-77 (CA11 2022) ("[I]t is a deviation 'from the essential nature, purpose, and competence of an appellate court' to address questions not passed upon by a district court").

Even if this argument were not waived, it is meritless. On one hand, according to Carollo, he is immune from liability for acting "consistent with[ ] his authority under the City Charter" to target Plaintiffs for First Amendment retaliation. Dkt.26:55 & 59. On the other hand, according to Carollo, he is also immune from liability for acting "contrary to … his authority under the City Charter" to target Plaintiffs for First Amendment retaliation. *Id*. (cleaned up). Carollo is wrong on both fronts: the "color of law" element of a § 1983 claim does not present such an insurmountable self-defeating barrier to liability in every case.

22

Rather, the district court properly delivered this Court's Pattern Jury Instructions, which explain that a government official can engage in illegal First Amendment retaliation *either* by selectively exercising his lawful authority *or* by exceeding his lawful authority, and here the record supports a jury finding that Carollo did *both*:

> A government official acts "under color" of law when he acts within the limits of lawful authority. He also acts under color of law when he claims to be performing an official duty but his acts are outside the limits of lawful authority and abusive in manner, or he acts in a way that misuses his power and is able to do so only because he is an official.

Dkt.27-4:32 (quoting 11th Cir. Pattern Jury Instr. § 5.1 (Mar. 2022)); *accord Bennett v. Hendrix*, 423 F.3d 1247, 1254-55 (CA11 2005) ("Taken in the light most favorable to the plaintiffs, the record is replete with" examples of a "prolonged and organized campaign of harassment by" government officials under color of law, including being "follow[ing], pull[ing] over, cit[ing], intimidat [ing]," and defaming plaintiffs by "depicting the[m] as criminals terrorizing the county").

First, in an interlocutory ruling that is the law of the case, this Court dispatched Carollo's argument that he is immune from liability for harassing Plaintiffs by abusing his lawful authority under the City Charter. *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (CA11 2005) (quoting *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (CA11 2000)) ("Under the law of the case doctrine, both the district court and the appellate court are generally bound by a prior

appellate decision of the same case" relating to "legal issues that were actually, or by necessary implication, decided in the former proceeding").

Specifically, this Court affirmed the district court's denial of Carollo's motion to dismiss because the complaint alleged that he "used his official authority to harass" Plaintiffs for exercising their First Amendment rights in violation of § 1983. *Fuller v. Carollo*, 2022 WL 333234, at *2 (CA11 Feb. 4, 2022). In other words, the complaint alleged, Carollo was "acting in his discretionary capacity as a city commissioner," and abused his authority by harassing Plaintiffs "on the pretense of performing an 'official investigation,'" "solicit[ing] noise complaints," and "conduct[ing] a 'park-and-walk' with city employees … without the knowledge of the city manager" to embellish or fabricate building code violations. *Id*. at *2-3.

Consistent with this Court's law-of-the-case ruling, "'[n]umerous courts have found that harassment in the form of constant monitoring, investigating or issuance of violations can contravene First Amendment rights.'" Trial.Dkt.99:17 (citing *Cuevas v. City of Sweetwater*, No. 15-22785-CIV, ECF No. 38 (S.D.Fla. Oct. 28, 2015) (quoting *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, Fla.*, 430 F. Supp. 2d 1296, 1316 (S.D.Fla. 2006) (citing cases)))); *accord Sweet Sage Cafe, LLC v. Town of N. Redington Beach, Fla.*, 380 F. Supp. 3d 1209, 1221–22 (M.D.Fla. 2019) ("A reasonable jury could … infer that the [municipal defendants] acted with a retaliatory motive" in carrying out targeted "enforcement" and "inspection[ ]"

actions; "[a]t some point mere coincidence morphs into something else. Where precisely is a question for the jury"); *Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 898 (E.D.Mich. 2003) ("Rarely does one hear such compelling and unrebutted evidence of the vindictive retaliatory action" which "establish[ed] a relentless pattern of harassment and vindictiveness," ranging from "unjustified administrative enforcement hearing and nuisance determination" to "the denial of building permits" "the excessive police presence" in plaintiff's properties and "the refusal to provide backup documentation for alleged noise and invoice violations").

Second, Carollo is also subject to immunity for harassing Plaintiffs by exceeding the limits of his lawful authority under the City Charter. In short, Carollo acted under color of law by reaching beyond his limited legislative role to harass Plaintiffs, including by making "false, defamatory statements" and "harass[ing] and threaten[ing]" Plaintiffs' "associates and employees." *Schopler v. Bliss*, 903 F.2d 1373, 1380 (CA11 1990); *accord Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 830 (CA11 1982) ("[A]n undertaking of repeated harassment is not within the scope of the Commissioners' discretionary authority").

In other words, Carollo's retaliation was closely related to his role as a City Commissioner yet "outside the scope of [his] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1547 (CA11 1995) ("Because [Carollo] acted outside the scope of [his] authority, [he] is not entitled to qualified immunity"). For instance, Carollo

25

persistently acted color of law by exceeding his authority as a legislative branch official under the City Charter and usurping the customary authority of executive branch officials to harass Plaintiffs. *See Estate of Cummings v. Davenport*, 906 F.3d 934, 941-42 (CA11 2018) ("Nothing in [state law] empowered" the defendant to make the specific challenged decision," and so "we cannot hold that he is entitled to qualified immunity simply because he had some authority to make other [similar] decisions").

In this regard, Carollo is particularly deceptive in arguing that all of his retaliation was supposedly nonactionable because it either drew from his power "to conduct legislative inquiries" under the Charter, or "did not draw upon the powers granted" by the Charter. DE 26:55-57. While Carollo refers to the Charter, he omits the provisions that most prominently illustrate a link between his official authority and his unlawful retaliation. For instance, Carollo's power to "give orders" to other City employees was narrowly constrained:

> Except for the purpose of inquiry ... the city commission, nor any committees nor members thereof shall give orders to any of the subordinates of the city manager, city attorney, city clerk and independent auditor general, either publicly or privately.

Pl.Ex.303:§4(D). In fact, exceeding those limitations constituted a crime:

> Any such … orders … on the part of … a member of the city commission … shall be deemed to be a violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term of not exceeding sixty

days or both, and in the discretion of the court shall forfeit his or her office.

*Id.*

Yet, according to the sworn testimony of several high-ranking government officials who worked closely with Carollo, he regularly harassed Plaintiffs *both* by exercising his lawful authority in a selective and abusive manner *and* by exceeding the limits of his lawful authority in a variety of ways that are far too numerous to recount exhaustively in this brief. *See, e.g.*, 4/11/23.Tr.:52-23, 56 (former City Manager testifying that he had "never been asked to perform" a harassing audit of a business similar to the one ordered by Carollo, and that his CFO "couldn't find anything on file in the city of another business that had an audited in this way"); 4/19/23.Tr.:12 (pretextual investigations); 4/20/23.Tr.:111-14 (soliciting noise complaints); 4/20/23.Tr.:86-87 (park-and-walks); 4/21/23.Tr.:34-35 (embellishing and fabricating other violations); 4/21/23.Tr.:80-81 (*ultra vires* retaliatory inspection of a business that had already been inspected and approved); 4/19/23.Tr.:130 (threatening to arrest Plaintiffs' employees); 4/24/23.Tr.:54-55, 73, 109 (threatening to withdraw official support of Plaintiffs' tenants).

3.    *The Trial Record Supports a Jury Finding of Causation*

The district court followed the detailed roadmap for submitting a § 1983 action to the jury in accordance with this Court's Pattern Jury Instructions, which accurately reflected Plaintiffs' burden to establish causation. Dkt.27-4:31-32 ("To

27

succeed on this claim, [Plaintiffs] must prove" that their "exercise of their First Amendment rights was a motivating factor in Joe Carollo's decision to retaliate," and rebut "Carollo's contention that he would have engaged in the same [retaliatory] activity … anyway"); *Artis v. Santos*, 95 F.4th 518, 531 (CA7 2024) ("[The] Pattern Jury Instructions … are 'presumed to accurately state the law'"). There is no merit to Carollo's argument that Plaintiffs were either required to prove, or failed to prove, "the 'absence of probable cause'" for Carollo's retaliation as "'an element of [their] case.'" Dkt.26:65.

<u>First</u>, Carollo's retaliation did not "utilize[ ] the legal system" to initiate a retaliatory prosecution (*Hartman*), arrest (*Nieves*), or lawsuit (*DeMartini*), Dkt.26:64, rendering a no-probable-cause instruction nonsensical in the context of this case. *See* Trial.Dkt.631 ("The [pattern] instruction … subsumes" the causation element given the facts of this case). Specifically, Plaintiff's claim was based on a vast array of systematic harassment that had "nothing to do with probable cause," for which "there is no hint of probable cause," and which does not implicate any formal proceeding governed by any probable-cause standard. *Frederickson v. Landeros*, 943 F.3d 1054, 1066-67 (CA7 2019); *accord* Trial.Dkt.99:17 (citing *Cuevas*, *supra* (quoting *Hollywood*, 430 F. Supp. 2d at 1316)) ("[C]onstant monitoring … can contravene First Amendment rights"); *Schopler*, 903 F.2d at 1380

28

(making "false, defamatory statements" and "harass[ing] and threaten[ing]" Plaintiffs' "associates and employees").

Under Supreme Court "precedents, determining whether government action violates the First Amendment requires application of different doctrines that vary depending on the circumstances." *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S.Ct. 1316, 1334 (2024) (Jackson, J., concurring). In turn, the Supreme "Court [has] made a clear distinction between" those specific forms of retaliation that give rise to "additional pleading and proof requirements" on the one hand, and "'ordinary' retaliation actions," like this one, "to which the requirements do not apply." *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 n.7 (CA9 2008).

Thus, in contrast to the three "closely related concept[s]" of retaliatory prosecutions, arrests, and lawsuits, the ordinary forms of retaliation at issue in this case are incompatible with the concept of probable cause. *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (CA9 2021). Carollo's retaliation—including trespassing on Plaintiffs' properties, embellishing and fabricating complaints, commandeering City employees, conveying defamatory threats to their tenants and employees, and more—was untethered from any formal legal process or judicial proceeding. *See, e.g.*, *supra*, at 8-10, 26 (citing record). And Carollo does not attempt to explain how a jury could possibly apply a "probable cause" standard to evaluate such freewheeling retaliatory acts that are "far afield from the typical retaliatory arrest," prosecution, or lawsuit. *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018).

In fact, all of the relevant characteristics of Carollo's far-reaching campaign of ordinary retaliation "circumvent[ ] the difficulties" that the no-probable-cause instruction is intended to solve. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1307 (CA11 2019) (citing *Lozman*, 585 U.S. at 98-99).

For one thing, Carollo's retaliation was not triggered by protected speech that "occurred very close in time to" the retaliation. *Id.* at 1305-06 (citing *Lozman*, 585 U.S. at 100-01). In those types of cases, unlike this one, the no-probable-cause instruction may be appropriate to account for the possibility that the "protected speech" was "a 'wholly legitimate consideration'" in deciding whether to initiate the challenged prosecution, arrest, or lawsuit. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) ("[T]he content and manner of" plaintiff's allegedly protected "speech … support[ed] probable cause" for an allegedly retaliatory arrest for disorderly conduct); *accord DeMartini*, 942 F.3d at 1306 ("[Plaintiff's] record requests and lawsuits—protected speech though it may be—" "necessarily had to [be] consider[ed]" in initiating an allegedly retaliatory lawsuit for extortion).

In stark contrast to those sorts of cases, Plaintiffs' "prior, protected speech" could never be a valid consideration underpinning any of Carollo's retaliation. *Lozman*, 585 U.S. at 100. Thus, "the connection between [Carollo's] animus and [Plaintiff's] injury" cannot possibly be weakened by any "legitimate consideration of [Plaintiffs'] speech," leaving a no-probable-cause instruction with no role to play

in this case. *Id*. Or, to put it another way, a no-probable-cause instruction does no work in eliminating any potential "complexity of proving (or disproving) causation" under circumstances that would make it functionally impossible to "discern whether" Carollo's retaliation "was caused by the … legitimate or illegitimate consideration of [Plaintiffs'] speech"; here, any consideration of Plaintiffs' protected speech was necessarily illegitimate. *Id.* at 98.

Moreover, Carollo's widespread retaliation did not utilize the legal system for a discrete arrest, prosecution, or lawsuit "where 'evidence of the presence or absence of probable cause … will be available in virtually every … case.'" *Bello-Reyes*, 985 F.3d at 700-01 (quoting *Nieves*, 139 S.Ct. at 1724); *Hartman v. Moore*, 547 U.S. 250, 261 (2006) ("[T]here will always be a distinct body of . . . evidence showing whether there was or was not probable cause"); *Turner v. Williams*, 65 F.4th 564, 580 (CA11 2023) ("[M]ost importantly,  a judge signed the warrant, indicating that probable cause existed"). Because the wide variety of Carollo's retaliatory harassment, intrusion, and defamation does not implicate any "equivalent … objective benchmark" or cognizable standard of proof, the no-probable-cause instruction "does not translate" to the circumstances of this case. *Bello-Reyes*, 985 F.3d at 701.

Additionally, Carollo's retaliation does not give rise to a "unique need to 'bridge'" a "causation gap between the non-prosecuting government agent's

retaliatory animus and the prosecutor's independent decision, which is accorded presumptive regularity." *CarePartners*, 545 F.3d at 877. While Carollo points out that this Court extended the no-probable-cause rule from the criminal context to a retaliatory civil lawsuit, it only did so after underscoring that the government-defendant retained "two separate outside attorneys" who "conducted investigations, evaluated the facts, and only then independently recommended the filing of the … lawsuit." *DeMartini*, 942 F.3d at 1304-05; *accord id*. at 1299 ("We have located only three circuit decisions involving § 1983 First Amendment retaliation claims predicated on a retaliatory civil lawsuit or counterclaim").

Here, however, the lion's share of Carollo's retaliation was committed without the intervention of any other independent attorney or court at all. And, to the extent that he may have commandeered other City employees to participate in certain aspects of his retaliation, none of them acted with sufficient independence to break the chain of causation or give rise to any presumption of regularity. Instead, Carollo made it clear that anyone who did not follow his illegal (against the City Charter) and unconstitutional (against the First Amendment) directives was subject to being "demoted or fired," and possibly being smeared with false accusations of sexual harassment as a pretext for their termination. 4/24/23.Tr.:194 (Deputy City Manager); 4/21/2023.:Tr.23 & 4/26/23.Tr.:35-36 (Carollo instructing his niece to lie about sexual harassment to terminate an aide); *accord* 4/18/23.Tr.:103-04, 143

(Chief of Police); Pl.Ex.643 (Carollo: "One of us going to be out of here before the other, and it ain't going to be me"). Thus, even when Carollo lacked probable cause to retaliate against Plaintiffs, he faced no resistance to "spearhead[ ]" the creation of new rules "that … target[ed]" Plaintiffs and no one else. 4/15/23.Tr.:32.

Second, even if a no-probable-cause instruction mapped onto the claims at issue in this case (which it does not), the overwhelming "entirety of the evidence" supported a jury finding that Carollo "acted with a retaliatory motive" irrespective of the presence or absence of probable cause. *Sweet Sage*, 380 F. Supp. 3d 1209.

Even where "the presence of probable cause" would ordinarily "defeat a § 1983 First Amendment retaliation claim" for a retaliatory prosecution, arrest, or lawsuit, exceptions exist for cases involving "'unique' … factual circumstances" mirroring this case, as well as for cases involving "'objective evidence'" that the plaintiff was subjected to disparate consequences compared to "similarly situated individuals [who] had not engaged in the same sort of protected speech." *DeMartini*, 942 F.3d at 1297-98. Both of those conditions exist in this case. *Gonzalez v. Trevino*, 144 S.Ct. 1663, 1678 (2024) (Jackson, J., concurring) ("[T]he lower courts may consider the full scope of objective evidence … to establish differential treatment" to overcome the existence of probable cause in a retaliation claim).[3]

---

[3] The "five 'unique' factual circumstances, which … combine together to create an exception to the general no-probable-cause requirement," and were proven in this case, are: (1) "more governmental action than simply an … arrest"; (2) a "retaliation

Notably, Carollo did not move to dismiss the complaint based on a purported failure to allege an absence of probable cause of "an element of [their] case," as a pleading matter. Dkt.26:65. And yet, as a matter of proof, the trial record overwhelmingly supports a jury finding that Carollo's retaliatory animus—and not action supported by probable cause—is what caused Plaintiffs' injury. That is true based on *both* the "unique … circumstances" of this case *and* the evidence that "people who had committed the same conduct, but who had not engaged in the same sort of protected speech," did not face the same retaliation. *DeMartini*, 942 F.3d at 1306.

One notable example of Carollo's differential treatment of Plaintiffs stems from his own "multiple failures to comply with the City Code" while pursuing Plaintiffs for similar alleged violations. Trial.Dkt.186:12; *accord* 5/1/23.Tr.:18-19. And, to the extent that Carollo's pervasive defamation of Plaintiffs as communists, fraudsters, and criminals leaves any room for reasonable doubt that his retaliation was motivated by retaliatory animus, rather than probable cause, *see* 5/10/23.Tr.:183, Carollo's differential treatment of Plaintiffs through selective enforcement permeates the entire trial record, including:

---

plan [that] was 'premeditated' and formed months earlier (before the [retaliation])"; (3) "'objective evidence' of a policy motivated by retaliation"; (4) the confluence of these factors which reduced any concern "about opening the floodgates of frivolous retaliation claims"; and (5) "plaintiff's speech … was one of the most precious of the liberties safeguarded by the Bill of Rights." *DeMartini*, 942 F.3d at 1294-95.

- Direct evidence and credible testimony that Carollo's retaliation stemmed "from his personal animus," "[n]ot necessarily code violations," and embraced a campaign of "selective enforcement" to "find[ ] a way to shut [Plaintiffs] down," which went "way beyond simple code infraction items" to "weaponiz[e] code enforcement against" Plaintiffs in particular. Pl.Ex.433 (Mayor); Pl.Ex.146 (Chief of Police); 4/19/23.Tr.:106 (Carollo's Chief of Staff); *id*.:121 (City Commissioner); 4/11/23.Tr.:43-47 (City Manager).

- Carollo's own acts and admissions, including stating to Plaintiffs tenants and business associates, that he "targeted" them because he "had it out for" Plaintiffs, and then stopping his harassment when they stopped doing business with Plaintiffs. 4/19/23.Tr.:174-75; 4/24/2023.Tr.:53-58, 61, 76-77, 113; *accord* 5/9/23.Tr.:244 (Carollo aide leading "Code Enforcement and police" to selectively target one of Plaintiffs' tenants, and no "other businesses" at a festival).

- Objective evidence that Carollo first created a "hit list" of Plaintiffs' businesses and properties to target for retaliation; was then warned by his advisors that was indicative of his illegal intent; and yet continued to persist in his targeting by making the barest effort to conceal his retaliation by adding a list of decoy properties in an effort to "justify the attack on [Plaintiffs'] business" and "cover" his illegal targeting of Plaintiffs. 4/11/23.Tr.:50-55; 4/19/23.Tr.:134.

In sum, the district court properly delivered this Court's Pattern Jury Instructions; Carollo did not identify the "absence of probable cause" as an element of Plaintiffs' claim as a basis for seeking dismissal of the complaint; Carollo did not develop his appellate argument for a new trial (based on inadequate instructions) as opposed to a judgment as a matter of law (based on inadequate evidence); and in all events, the trial record overwhelmingly supports the jury's finding of causation based on Carollo's retaliatory animus irrespective of probable cause. *See Alzamora v. Sec'y Dept. of Corr.*, 463 F. App'x 816, 818 (CA11 2012) (citing *Neder v. United States*, 527 U.S. 1, 15 (1999)) (harmless error).

## B.  <u>The Trial Court Did Not Abuse Its "Large Discretion" in Denying Carollo's Motion for Mistrial</u>

Because Carollo could not counter the strength of Plaintiffs' case on the merits, his persistent attempts to induce a mistrial became so transparent that the district court called them out on the record:

> You can't claim a mistrial on one hand when you're purposely interjecting it. That's exactly what has gone on throughout this trial. … That clearly was willfully done as a strategy, again, … purposely trying to interject a mistrial in the event that you do not get the decision that you want."

5/3/23.Tr.:59-60 (emphasis added).

Carollo cannot overcome the district court's "large discretion" in investigating, remediating, and making the ultimate "factual determination of whether" any reasonable possibility of prejudice was caused by a juror's fleeting

extrinsic contact with a nonparty. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1472 (CA11 1992); *accord United States v. Caldwell*, 776 F.2d 989, 1000 (CA11 1985) ("[S]uch decisions must be made by the district court during the 'heat of the fray'" and do not constitute reversible error even "if the proceedings below may not have been perfect").

1. *The District Court Did Not Abuse Its "Large Discretion" to Investigate and Address a Juror's Fleeting Extrinsic Contact with a Nonparty*

Following a day of trial, one of the jurors shared a parking-garage elevator with a nonparty that happened to have parked on the same floor as her. When the juror pressed the elevator button and asked which button she could press for the other "young man," he first tried to "respond[ ] in a funny manner with laughter," saying that "I'm following you," before telling her, "I'm going to five [i.e., the fifth floor] also." 4/24/23.Tr.:9. He then extended his comment by "indicat[ing] that people should be careful because last week or a few days ago, a former chief of police came to testify in a case and when the former chief of police was leaving, he was followed by two PIs." *Id*.

The parties and the district court eventually learned that the individual who interacted with the juror was one of Plaintiffs' dozens of business partners (Zach Bush). The juror, however, was never able to identify him. She only "recognized [him] from attending the trial on plaintiffs' side ... in the back." *Id*.:9, 11. But, as the district court observed, "[i]t's a public courtroom," and "a lot [of]

traffic and a lot [of] attention has been following this case." *Id.*:11. Thus, the district court instructed the jury to disregard the interaction:

> I instruct you that this contact had nothing to do with either party. It has nothing to do with the plaintiff, neither the defendant, Commissioner Joe Carollo, and that the contact is impermissible.

*Id.*:11, 206.

In fact, the juror was so unfazed by the interaction that she questioned whether it was "worth even bringing forward," but decided to report it after mentioning it to "a few of us [jurors] that were in the room" and asking for their input. *Id.*:22. The juror was adamant that the interaction "[a]bsolutely" had no bearing on her ability to be "fair and impartial" or to "follow [an] instruction" to disregard the interaction in her deliberations. *Id.*:22-23. She only brought the matter to the Court's attention because some of the other jurors encouraged her to "share it." *Id.*:22. On her way out, the district court remarked, "I appreciate you"; and the juror responded without distress: "No problem. Scared me. It's all good.".[4]

In an abundance of caution, the district court cleared the courtroom and conducted an *in camera* interview with each juror individually in the presence of

---

[4] Throughout his brief, Carollo seizes on this off-hand remark to harp on the unreasonable inference that the juror harbored a fear for her physical safety. The far more reasonable interpretation of this comment is that it "scared" the juror to be called into a nearly empty courtroom for questioning as though she had done something wrong, but that it was "all good" after it was confirmed why she had been singled out.

counsel to assess whether they had learned about the interaction and, if so, whether they could disregard it without allowing it to affect their deliberations. Without exception, every juror confirmed in their own words that they either had not learned about the interaction in the first instance, or that the interaction was at worst "weird," "uncomfortable," or a harmless "joke," but did not affect their "ability to be fair and impartial either to the plaintiff or to the defendant" and render a verdict based only on the evidence and testimony admitted at trial. *Id.*:21-30.

After interviewing each juror, the district court was emphatic in finding that none of the jurors had been exposed to any extrinsic evidence that could possibly result in prejudice to any party:

> I looked at these people [the jurors] in their eyes. Unfortunately, it's an incident that did occur, confidence a hundred percent that they are fine. Otherwise, I wouldn't sit up here at all. They came into this courtroom during sidebar, I looked them in the eye, be straightforward.

*Id.*:34; *accord id.*:197 ("I would definitely exclude" any jurors if the incident "would ... affect them" or if "the curative instruction should do any harm. ... If it was .0001 percent, if they have any doubt, you saw them"). Carollo's counsel reflected on having "done lots of these jury inquiries before," and commended the district court's approach:

> The way you handled it is exactly the way I would have expected you would do, so that kind of personality and discussion was very … comfortable. And I think doing that with all the jurors would be appropriate.

39

*Id.*:24; *accord id.*:36 ("With regard to the inquiry, we appreciate the detail of Your Honor's inquiry").

The district court then granted Carollo's request to explicitly underscore in its curative instruction that Mr. Bush's interaction with the juror was "impermissible." *Id.*:196. Moreover, when Carollo requested that the curative instruction also make it clear that "nothing associated with the sidebar inquiry is to be directed to the defendant Joe Carollo, that there is no involvement by Joe Carollo in any of this," the district court went one step further and instructed the jury that the extrinsic matters were "not related to this case at all, period. Not just Joe Carollo, it has nothing to do with this case," to avoid "giv[ing] them . . . an idea that something's going on." *Id.*:33; *accord id.*:195. As the district court observed, Carollo's request for the district court to instruct the jury that Mr. Bush "is identified with, associated with, [and] involved with the plaintiffs"—beyond the evidence in the record—would create just the sort of extrinsic taint that Carollo purports to oppose. *Id.*:197; *accord id.*:201-04. Neither party asked the district court to excuse any juror.

In the end, the district court incorporated some portions of each party's competing curative instructions, rejected others, and delivered an unequivocal directive to the jury at the end of that day's session, "reiterat[ing]" that its verdict "must be based solely on the evidence and instructions occurring only inside of this courtroom," and that any extrinsic "matter … can play no part in [its] decision."

*Id.*:201-03. The district court then repeated that instruction at the close of the case before deliberations. 5/31/23.Tr.:15, 58, 160.

Mr. Bush was not "central" to Carollo's case, as Carollo misrepresents in this appeal. Dkt.26:31. In fact, he had only appeared on Plaintiffs'—not Carollo's—pretrial witness list, and it is undisputed that neither party ever intended to make him "a witness in this case at all." 4/24/23.Tr.:39; *accord id.* at 35. Nor is it true, as Carollo misrepresents in this appeal, that Carollo was "barred from presenting evidence he promised the jury" in his opening statement, in the form of a "video [involving] Carollo and a constituent." Dkt.26:52. In fact, the video that Carollo played during his opening statement was introduced as an exhibit and replayed several times at different days during the trial (along with another video showing the same incident from a different angle which was played but not admitted as an exhibit (Pl.Ex.298)). *See* Def.Ex.333; 4/25/23.Tr.:32-33 (Carollo's counsel: "So the gentleman in that video harassing Commissioner Carollo …, was that Zach Bush?"); *id.*:85 (replaying video); 5/1/23.Tr.:160 (replaying video).

It was only after Carollo sensed an opportunity to derail the proceedings, prejudice Plaintiffs, and instigate a mistrial that he redirected his trial strategy to direct as much attention to Mr. Bush as possible. As the district court noted, however, the evidence relating to Mr. Bush that Carollo had referenced in his opening statement was "already in evidence," 5/3/23.Tr.:66, and it was *Carollo* who

was attempting to "focus[ ]" the jury's attention on Mr. Bush's extrinsic contact with the juror "as a sword" to prejudice the jury against *Plaintiffs*, not the other way around:

> What you've done throughout this trial is circumvent my curative instruction when you got what you wanted by introducing this evidence and showing this juror this is the person here, hoping her memory is refreshed to prejudice her.

*Id.*:61-62. As the district court noted, the juror "didn't identify" Mr. Bush, and so Carollo changed his trial strategy midstream at trial "to direct a particular juror" to believe, based on extrinsic evidence, that Plaintiffs were "purposely trying to influence this particular juror." *Id.*:64-65 ("It became woefully clear what you're doing in this case …, hoping that maybe you'll prejudice the plaintiffs' case"; "clearly, it was improper"). Carollo repeatedly played the video he promised in his opening, he repeatedly elicited testimony of witnesses (including his own) pertaining to Mr. Bush, and there was no error—much less harmful, reversible error—in the district court's heat-of-battle evidentiary rulings to manage the trial schedule and the introduction of cumulative testimony.

2.  *The District Court Did Not Abuse Its "Large Discretion" to Reject Carollo's Efforts to Induce a Tactical Mistrial and to Find No Reasonable Possibility of Prejudice*

After being admonished by the district court for bending over backwards to engineer a tactical mistrial in the proceedings below, Carollo's attack on the district

court's discretionary rulings in this Court are not based on an accurate statement of the relevant facts or applicable law.

Start with the legal standard: Relying on principles derived from criminal cases, Carollo misstates that it is supposedly a "matter of established law" that "prejudice is presumed the moment the defendant establishes that 'extrinsic contact with the jury in fact occurred.'" Dkt.:26:45. But even in criminal cases, it "is now well established that less serious instances of potential taint should be addressed using the abuse-of-discretion standard, with the presumption of prejudice being reserved for more serious instances." *United States v. Pagan-Romero*, 894 F.3d 441, 447 (CA1 2018) (citing cases).

On multiple occasions, the presumption of prejudice has been "called into doubt" by the Supreme Court, leading several Circuits to question its continued viability even in criminal cases. *United States v. Sylvester*, 143 F.3d 923, 934 (CA5 1998) (citing *Smith v. Phillips*, 455 U.S. 209 (1982)) ("[The] presumption of prejudice cannot survive"); *United States v. Olano*, 507 U.S. 725 (1993)); *accord United States v. Williams-Davis*, 90 F.3d 490, 501 (CADC 1996) ("[T]he presumption of prejudice has eroded"); *United States v. Cardena*, 842 F.3d 959, 976 (CA7 2016) ("[N]ot all extraneous influences are presumptively prejudicial"); *United States v. Baptiste*, 596 F.3d 234, 221 (CA4 2010) ("[T]he presumption is not one to be casually invoked"; "the defendant bears the initial burden of" not merely

43

"establishing ... that an unauthorized contact was made," but also "that it was of such a character as to reasonably draw into question the integrity of the verdict") (cleaned up). Even this Court has indicated that "[p]rejudice is not presumed" when "jurors consider extrinsic evidence." *United States v. Rowe*, 906 F.2d 654, 656 (CA11 1990).

The existence of a presumption of prejudice is even more dubious in civil cases like this one where no Constitutional liberty interests are at stake. Rather, in the civil context, this Court has required the party alleging a jury's "consideration of extrinsic evidence [to] first establish prejudice by a preponderance of credible evidence" that the evidence "poses a reasonable possibility of prejudice to the defendant." *BankAtlantic*, 955 F.2d at 1471 (cleaned up).

Regardless of any presumption, Carollo cannot overcome the district court's "large discretion" both in how it investigates a report of extrinsic contact and in how it ultimately decides whether the contact was prejudicial. *Id.* at 1472. And even in a criminal case, even where the extrinsic evidence was in the jury room during deliberations, and even where a presumption of prejudice was applied, this Court still held "the district court's failure to investigate" the matter at all was harmless because the extrinsic evidence "did not create a reasonable possibility of prejudice" in light of the circumstances of the case as a whole. *United States v. Pessefall*, 27 F.3d 511, 516 (CA11 1994).

44

Throughout the trial and to this day, Carollo struggles to articulate a coherent—much less a "clear, strong, substantial and incontrovertible"—theory of prejudice that is not based on an unreasonable stacking of inferences and speculation. *United States v. Benjamin*, 958 F.3d 1124, 1137 (CA11 2020). For instance, there is no indication that any juror broke their promise to disregard any extrinsic evidence; no indication that any juror disregarded the district court's instruction that the extrinsic evidence had nothing to do with this case; no indication whether a reasonable juror would be inclined to construe the interaction as a report, as a warning, or as a threat; no indication that any juror took the interaction seriously; and no indication of which party might be prejudiced as a result.

Consequently, as the district court repeatedly pointed out, Carollo's position on the matter has repeatedly shifted between improperly highlighting the extrinsic contact to the jury to cause prejudice to Plaintiffs and laying the groundwork for a tactical mistrial by claiming it as a source of prejudice to himself. *See United States v. Rowe*, 906 F.2d 654, 657 (CA11 1990) ("Since [the extrinsic] statements … could as easily have evoked sentiments generating leniency as they could have engendered an inference of guilt," they were "simply too attenuated" to "even rise to the level of significance requiring a … showing of harmlessness" and "clearly do not no establish the sort of prejudice meriting a new trial").

45

Though Carollo attempts to rely on a criminal case involving a presumption of prejudice, Plaintiffs agree that *United States v. Ronda*, 455 F.3d 1273 (CA11 2006), provides an instructive framework for analyzing this case. There, as here, the district court did not abuse its discretion in finding that "the nature of extrinsic evidence was relatively inconsequential," and "unlikely to prejudice the jury in any meaningful fashion," primarily because the district court "took care to instruct the jury that [it] was in no way related to the trial, and that the jury was to reach a verdict based solely on the evidence presented at trial," exactly as happened here. *Id*. at 1300; *accord Samia v. United States*, 599 U.S. 635, 646 (2023) ("[O]ur legal system presumes that jurors will attend closely the particular language of [curative] instructions") (quotation marks omitted).

Second, "the district court's careful and lengthy efforts to ensure that the jury remained impartial are quite similar" to other cases in which this Court "deferred to the district court's assessment of the … jurors' impartiality"—in which "demeanor plays such an important part"—after conducting a "voir dire" of each juror, delivering "curative instructions," and "observ[ing] the jurors for several weeks," along with "the jurors' unequivocal pledges to deliberate fairly." *Id*. at 1300-01. Though Carollo might have preferred for the district court to compel Mr. Bush to respond to additional questions (that could not have affected the prejudice determination) or deliver a slightly different curative instruction (that would have

46

only caused greater jury confusion and prejudice), those differences of opinion do not amount to an abuse of the district court's discretion.[5]

Third, the Court did not address "the strength of the government's case" in *Ronda*, but that provides yet another reason not to disturb the district court's exercise of discretion here. Carollo only says that the strength of Plaintiffs' case was weak based on the formalistic legal objections that he raises in this appeal. But those legal issues were not a matter for the jury's consideration and so they are irrelevant to the inquiry of whether the jury was swayed by any extrinsic evidence. As far as the evidentiary factual record is concerned, the strength of Plaintiffs' case overwhelmed any illusory prejudice stemming from the fleeting extrinsic contact. *See generally United States v. Siegelman*, 640 F.3d 1159, 1185 (CA11 2011) ("In view of the limited and incidental nature of this exposure and the substantial evidence of defendants' guilt … we hold that the district court did not abuse its discretion").

The "district court identified and weighed the correct factors and made findings of fact supported by the record," which do not reflect a "clear error of judgment" under this Court's "deferential standard of review." *United States v.*

---

[5] To the extent that Carollo implicitly argues that the district court abused its discretion by "not excus[ing]" the juror exposed to the extrinsic contact, DE 26:35-36, he forfeited that argument by failing to request the dismissal of any juror in the proceedings below. *See Port Terminal & Warehousing Co. v. John S. James Co.*, 695 F.2d 1328, 1338-39 (CA11 1983) ("The trial court cannot be faulted" for failing to impose relief for jury misconduct when "appellants ... made no such request" for that relief).

*Whatley*, 719 F.3d 1206, 1221 (CA11 2013). Nor can Carollo establish any error by comparison to cases involving the most extreme instances of incurable misconduct dissimilar to this case, including jurors who: "ignored the court's instructions," "used a dictionary to define several words … during deliberations," "frequently … read" newspapers and "watched themselves on television," and discovered through the media that they "had become the focus of an investigation" (*Martinez*); had an undisclosed "familial connection to a party" (*Fylling*); and provided testimony "riddled with contradictions" and "destroy[ed] all relevant data" after text messages showed that she "looked up the case online," texted a prosecutor "seeking input about the case." (*Lanier*). Dkt.26:45-53.

**C.**   **The Trial Court Did Not Abuse Its "Considerable Discretion" in Denying Carollo's Motion for New Trial or Remittitur**

The district court already reviewed the unanimous jury's evaluation of "the demeanor of the witnesses"; its assessment of the "intangible, emotional" and reputational harm resulting from an extraordinary campaign of First Amendment retaliation; and its computation of the amount of damages necessary to compensate Plaintiffs, punish Carollo, and deter other similarly situated defendants from engaging in similarly diabolical misconduct. *Bogle*, 332 F.3d at 1359. Constitutional tradition and this Court's precedents afford considerable deference to those subjective assessments of the jury and the district court. *Munoz v. Oceanside Resorts,*

*Inc.*, 223 F.3d 1340, 1349 (CA11 2000) (quoting *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (CA11 1999)) (brackets omitted).

Particularly after submitting a Statement of the Case that only recited the facts favorable to himself and omitted all unfavorable facts, in violation of this Court's Rules (*see* 11th Cir. R. 28-1(i)), Carollo is wrong to cherry pick a handful of mostly outdated, outlying, and distinguishable cases to mischaracterize the damages in this case as being "in a different stratosphere" than, or "not even in the ballpark" as, a permissible award. Dkt.26:72-75.

The damages awarded for the emotional and reputational harm that Carollo inflicted over a five-year campaign of relentless defamation, intimidation, weaponization of City government comports with the range of damages awarded in other cases involving similar retaliation and defamation, including in the § 1983 context, and particularly when the attacker is a high-profile public figure like Carollo is in Miami. *See, e.g., Carroll v. Trump,* 2024 WL 1786366, at *5–6 (S.D.N.Y. Apr. 25, 2024) ($18.3 million); *Freeman v. Guiliani,* No. 21-CV-03354, DE 159 (D.D.C. Apr. 15, 2024) ($146.2 million); *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-231 (E.D.N.Y. 2010) ($150 million based on false statements accusing Plaintiff of associating with the Mexican cartel and "evidence demonstrating that the injury to [plaintiff's] reputation led to lost contracts valued at" millions of dollars); *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 222 A.D.2d 1020, 1020, (N.Y.App.Div. 1995)

($3.5 million for emotional and physical injury plus $6 million for injury to reputation)*; Harper v. City of Los Angeles*, 533 F.3d 1010, 1028-29 (CA9 2008) ($5 million award to each plaintiff in a civil rights case for the "'impairment of reputation, personal humiliation, and mental anguish and suffering")*; Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1065 (D.Or. 2017), *aff'd*, 925 F.3d 1097 (CA9 2019) (affirming $3 million jury award for non-economic damages)*.*[6]

Moreover, Plaintiffs and the district court already explained at length why Carollo is not entitled to second-guess the jury's award based on closing arguments to which he did not object at trial. Trial.Dkt.538:10; Trial.Dkt.:631:6-7. "A finding of plain error is seldom justified in reviewing argument of counsel in a civil case," and here the "district court did not err, plainly or otherwise." *Wallace v. Mangiaracina*, 745 F. App'x 356, 359 (CA11 2018). As he did below, Carollo complains about Plaintiffs' so-called "invitation to consider purported facts in evidence" during closing argument, Dkt.26:72, but relies on a case in which similar

---

[6] Carollo's apples-to-oranges comparators are not illuminating. Dkt.26:72-74. *Wilson v. Taylor*, 733 F.2d 1539, 1549 (CA11 1984) ("slight" injury for feeling "frustration and ultimate betrayal"); *Ash v. Tyson Foods, Inc.*, 664 F.3d 884, 899 (CA11 2011) (no testimony regarding reputational harm for being associated with a communist regime, causing lost business opportunities worth millions of dollars); *Paeth v. Worth Tp.*, 483 F. App'x 956, 967 (CA6 2012) (same); *Salinas v. O'Neill*, 286 F.3d 827, 833 (CA5 2002) (same); *Dossett v First State Bank*, 399 F.3d 940, 946 (CA8 2005).

statements were "vague puffery" that "did not reach the standard required to mandate a new trial." *Nichols v. Fannin*, 2018 WL 2220872, at *16 (N.D.Ga. Apr. 16, 2018).

The evidence and testimony of Plaintiffs' damages was not "rudimentary," as Carollo claims, nor did the jury exceed the "maximum possible award" for compensatory damages that is supported by the trial record. Dkt.26:70-74. Rather, the jury's verdict was in line with the "ample evidence, both through [Plaintiffs'] own testimony and with testimony from [their] wi[ves]," and many others, "concerning the emotional damage that [they] suffered as a result of [Carollo's] actions." *Greisen v. Hanken*, 252 F. Supp. 3d at 1065; *Kim v. Nash Finch Co*., 123 F.3d 1046, 1065 (CA8 1997) ("A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden" without "[m]edical or other expert evidence … to prove emotional distress") (cleaned up); *Miko v. Jones*, 2023 WL 196920, at *2 (N.D.Ga. Jan. 17, 2023) ("[T]he plaintiff in a Section 1983 action may be awarded actual compensatory damages for any demonstrated mental and emotional distress, impairment of reputation, and personal humiliation," including based on plaintiff's testimony that "he became anxious, stigmatized, lost his ability to socialize with others, and suffered significant emotional distress"); *Tuggle v. Hill*, 2009 WL 10688077, at *2 (N.D.Ga. May 4, 2009) (similar).

Finally, the unanimous jury did not impose an "unconstitutionally excessive" award of punitive damages, which was less than three times the amount of reasonable compensatory damages for a retaliation campaign that not only destroyed Plaintiffs' sense of security and reputations, but also punished Plaintiffs for exercising and chilled others from exercising "one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman*, 585 U.S. at 89. Not to mention the damaging effects of purging City Hall of dedicated public servants courageous enough to object to a campaign of illegal and unconstitutional retaliation.[7]

Carollo identifies no abuse of discretion in the district court's thorough and well-reasoned analysis of this issue, weighing all of the relevant "guideposts," and concluding that the jury's award of punitive damages was reasonable and necessary "to achieve punishment [and] deterrence" for Carollo's retaliation that was so "continuous," "unrelenting," "intentional," and "malicious" that it "shock[ed] the conscience." Trial.Dkt.:631:6-8 (quoting, *inter alia*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418-19 (2003)); *accord Smith v. Wade*, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under

---

[7] Even if Carollo had advanced a valid legal basis for reducing Plaintiffs' recovery of compensatory damages, the relevant denominator for purposes of assessing the proportionality of a punitive damages award remains the value of "the actual harm that has occurred, [and] not necessarily" the amount of compensatory damages that are ultimately recovered. *Davis v. White*, 2022 WL 3083458, at * 2 (N.D.Ala. Aug. 3, 2022) (quoting, *inter alia*, *S.E. Prop. Holdings, LLC v. Judkins*, 882 F. App'x 929, 937 (CA11 2020)).

§ 1983" for misconduct that is "motivated by evil motive or intent," or "involves reckless or callous indifference to the federally protected rights of others"); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044-45 (CA9 2003) (rejecting challenge to a $2.6 million punitive damages award in a civil rights case, given that the defendants' conduct "was highly reprehensible, and the punitive award exceeded the compensatory award by a single-digit multiplier").

In general, "[s]ingle-digit multipliers are more likely to comport with due process," and only "an award of more than four times the amount of compensatory damages" raises concerns "of constitutional impropriety." *Campbell*, 538 U.S. 408, 425 (2003). Indeed, this Court discourages "a mechanical application of the Supreme Court's single-digit multiplier formula" and encourages flexibility and discretion in imposing punitive damages that "promote deterrence effectively." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1363 (CA11 2004) ("[T]he Supreme Court has resisted establishing a specific ratio beyond which a damage award will violate the Constitution"). Particularly in cases like this one, where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine,'" the "Supreme Court recognize[s] that there [are] times when a substantial disparity between actual damages and the punitive award would be expected and, therefore, not constitutionally excessive." *Johansen v. Combustion*

*Eng'g, Inc.*, 170 F.3d 1320, 1338 (CA11 1999) (*quoting BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 584 (1996)).

Thus, a "reasonable and proportionate" punitive damage award "in the neighborhood of 4:1" is a "range which the Supreme Court has found to be 'instructive.'" *Bogle*, 332 F.3d at 1362. "Under the circumstances" where a "punitive damages award of $17.5 million [was] proportionally related to the compensatory damage award of approximately $3.2 million," this Court has affirmed a multiplier greater than 5:1. *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (CA11 2007). And, this Court has even approved a "100:1 ratio of the punitive to the actual damages [which] is at the upper limits of the Constitution, but is justified by the need to deter." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339 (CA11 1999); *accord Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) (4:1 multiplier); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443 (1993) (526:1 multiplier).

In sum, the unique circumstances of this case do not raise any constitutional concerns in which the need for punishment and deterrence is at its zenith. If Carollo's misconduct were permissible, then no private individual would dare to support the candidate of his choice, much less support Carollo's opponent or confront Carollo in the political arena. For several years, including after the entry of the verdict in this case, Carollo abused his government authority to retaliate against Plaintiffs for their

political expression by launching a campaign to make it impossible for Plaintiffs to function in society or earn a living by targeting them for "continuous and unrelenting" harassment. Trial.Dkt.631.8. Carollo's retaliation cast a wide shadow of collateral damage affecting Plaintiffs' employees, banks, partners, tenants, customers, and others close to them, and purged City Hall of professional career public servants who resisted Carollo's illegal and unconstitutional retaliation, to the detriment of the City. *See* 5/8/23.Tr.:107-12, 149-55, 170, 185-86; 5/10/23.Tr.: 80-82, 104-105. *See generally* Trial.Dkt.539:7-11; Trial.Dkt.631:5-9.[8]

---

[8] Carollo misrepresents that the district court supposedly "instructed the jury to ignore Carollo's salary." Dkt.26:60. The district court already explained why this is false. Trial.Dkt.631:7; *accord* Trial.Dkt.539:14. And, as this Court can see for itself, the district court delivered this Court's Pattern Jury Instructions, expressly directing the jury to "consider the evidence regarding Joe Carollo's financial resources in fixing the amount of punitive damages to be awarded," which includes the City Charter reflecting the salary for commissioners. Trial.Dkt.475:11; Pl.Ex.303. During his closing argument, however, Carollo's counsel misstated Carollo's salary, resulting in a sidebar colloquy, and an objection that the district court properly sustained. 5/31/23.Tr.:143-44, 153. Whether it was a tactical decision or an inadvertent mistake, Carollo never mentioned— either to the jury or to the district court—that the City Charter reflected Carollo's actual salary as a commissioner. Thus, the district court merely struck Carollo's counsel's *inaccurate and unfounded* "statement … as to Joe Carollo's salary [being] $57,000," while inviting the jury to consider "the evidence" in the record as to his *actual* salary, which includes the City Charter. Dkt.27-4:35. The district court correctly instructed the jury to determine Carollo's financial means based on the evidence in the record, not the inaccurate statement of his counsel in closing argument, and any purported error was both invited by Carollo and harmless. Trial.Dkt.631:7.

## CONCLUSION

Despite one former President's famous quip, the "nine most terrifying words in the English language" are not "I'm from the government, and I'm here to help." The President's News Conference, Chicago, IL (Aug. 12, 1986), Ronald Regan Presidential Library & Museum, at https://tinyurl.com/4r3nxz5c. Rather, as Plaintiffs had the misfortune to learn, it is far more terrifying to be told, "I'm from the government and I'm here to harm." The six-week trial record in this case demonstrates the emotional and reputational toll that Carollo's misconduct inflicted on Plaintiffs. But that is not all. It also presents a harrowing case study reflecting the early signs of an eroding fabric of democracy and a slide into authoritarianism.

WHEREFORE Appellees William O. Fuller and Martin Pinilla, II, respectfully request that this Court affirm the district court's final judgment.

AXS LAW GROUP PLLC

/s/ Jeffrey W. Gutchess
Jeffrey W. Gutchess
Rossana Arteaga-Gomez
Samuel J. Etkin Kramer
Joanna Niworowski
Joshua A. Shore
2121 NW 2nd Avenue, Suite 201
Miami, Florida 33127
Telephone: (305) 297-1878
jeff@axslawgroup.com
rossana@axslawgroup.com
sam@axslawgroup.com
joanna@axslawgroup.com
josh@axslawgroup.com

*Counsel for Plaintiffs/Appellees*
*William O. Fuller and*
*Martin Pinilla, II*

## CERTIFICIATE OF COMPLIANCE

This brief complies with type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 32-4 because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this brief uses a monospaced typeface and contains 12,829 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) as the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

/s/ Jeffrey W. Gutchess
Jeffrey W. Gutchess

58

## CERTIFICATE OF SERVICE

I HEREBY certify that on July 1, 2024, I electronically filed the foregoing with the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Jeffrey W. Gutchess
Jeffrey W. Gutchess